[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 2, 2011
JOHN LEY
CLERK

_____

No. 08-13814

_____

D. C. Docket No. 06-80151-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARIO NARANJO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 2, 2011)

Before EDMONDSON and PRYOR, Circuit Judges, and EVANS,* District Judge.

PRYOR, Circuit Judge:

_____

* Honorable Orinda D. Evans, United States District Judge for the Northern District of
Georgia, sitting by designation.

The main issue in this appeal is whether there is sufficient evidence to support Mario Naranjo's convictions for concealment money laundering related to his operation of a Ponzi scheme that caused over one hundred victims to lose collectively over $2.7 million. The government presented evidence that Naranjo made three large cash withdrawals from bank accounts that contained fraudulently obtained proceeds of the Ponzi scheme and that Naranjo attempted to hide his association with the account holders. Viewed in the light most favorable to the government, this evidence supports a finding that Naranjo intended to conceal the ownership and source of funds obtained by fraud.

Naranjo also makes four other arguments. First, Naranjo argues that the government failed to prove that he intended to defraud his victims and that we should vacate his convictions for fraud and for various charges that relate to his use of proceeds of the Ponzi scheme. Second, Naranjo contends that the government failed to disclose evidence in violation of the Jencks Act, 18 U.S.C. § 3500, and the Due Process Clause of the Fifth Amendment, see Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Third, he argues that the district court violated his rights to due process under the Fifth Amendment and to confront his accusers under the Sixth Amendment by admitting summary evidence of financial records at trial. Fourth, Naranjo argues that the district court erred when it enhanced his sentence

based on estimates of the losses he caused. These arguments lack merit. We affirm Naranjo's convictions and sentence.

## I. BACKGROUND

On March 8, 2000, Naranjo incorporated MRNA Financial, Inc., in Florida for the purpose of operating a check cashing and payday loan business. On June 28, 2001, Naranjo opened an account for MRNA at First Union Bank (later Wachovia Bank) and designated himself as a signatory on the account. Although MRNA was administratively dissolved on September 21, 2001, Naranjo kept the MRNA account open and began to solicit capital from investors purportedly to fund the business venture. MRNA received its first contributions from investors in May 2002.

On January 29, 2003, Naranjo and Charles Carver incorporated in Florida The Loan Shoppe, Inc., for the stated purpose of providing check cashing, payday loan, and car loan services. Carver served as the sole officer and director of The Loan Shoppe. Corporate filings listed Carver as the incorporator and originally listed Naranjo as the registered agent, but a third person replaced Naranjo as the registered agent on February 21, 2003. Thereafter, Naranjo was not listed on corporate filings of The Loan Shoppe.

On February 7, 2003, Naranjo and Carver purchased an existing check

cashing business from Ouri Kahn for $24,000. Naranjo negotiated and financed the purchase, but Carver signed the purchase agreement. Under the agreement, Kahn assigned his leases for two stores in Miami and Davie, Florida, to Carver to operate as The Loan Shoppe. Florida law did not allow Kahn to transfer his check cashing license, so The Loan Shoppe submitted an application for a license to the Florida Department of Financial Services soon after the acquisition of Kahn's stores. The license application represented that Carver would operate the business and made no reference to Naranjo.

On February 24, 2003, Naranjo and Carver opened a bank account for The Loan Shoppe at Wachovia Bank in Florida. The account listed both Naranjo and Carver as signatories. After The Loan Shoppe began its operations, Carver helped manage the business, but Naranjo, among other responsibilities, determined how much working capital to provide the stores. Naranjo gave checks to Carver, who cashed the checks and delivered cash to the stores.

In May 2003, the Florida Department of Financial Services requested additional information about The Loan Shoppe and its owners to process the license application. Instead of providing the requested information, The Loan Shoppe withdrew its application for a state license. The Loan Shoppe continued to provide check cashing services, but the Department later issued a cease and desist

4

letter that stated that The Loan Shoppe could not cash checks without a license. The Loan Shoppe never obtained a license to cash checks or issue payday loans in Florida and instead affiliated with another check cashing company called Intertransfers, Inc., in June 2003. This affiliation allowed The Loan Shoppe to cash checks legally.

In the summer of 2003, Naranjo dispatched Carver to Alabama to develop plans for the expansion of The Loan Shoppe into the Birmingham metropolitan area. Carver and Naranjo soon announced that they were closing their Florida stores and relocating their business to Alabama. Carver applied for a certificate of existence for The Loan Shoppe and, on August 13, 2003, Carver registered The Loan Shoppe, L.L.P., in Alabama. Registration documents listed Carver as the president and agent. On September 26, 2003, Carver and a third party opened a bank account for The Loan Shoppe, Inc. at the National Bank of Commerce in Alabama. The Loan Shoppe never obtained an Alabama license, but operated three check cashing stores in Pelham, Irondale, and Alabaster, which are suburbs of Birmingham. The Loan Shoppe completed its relocation to Alabama and closed its Florida stores in the late summer or early fall of 2003. Carver opened two more bank accounts for The Loan Shoppe in Alabama in 2004. Carver and a third person were largely responsible for managing the Alabama stores. Naranjo never

visited the Alabama stores.

Naranjo remained in Hollywood, Florida, where he oversaw a multi-million dollar capital investment operation, created allegedly to finance the expansion of his small chain of check cashing and payday loan stores. After the establishment of MRNA and continuing after the incorporation of The Loan Shoppe, Naranjo issued bonds and promissory notes to investors that promised high interest rates in exchange for their investments. Naranjo hired several salesmen to help solicit investments, purchased "lead sheets" that listed potential investors, prepared a scripted sales pitch for his salesmen, and instructed salesmen to not contact individuals named on a list of "undercover regulators" he had developed. Naranjo told his salesmen that The Loan Shoppe was "very profitable," and salesmen promised investors annual returns of 10 percent on the bonds and 18 or 24 percent on the promissory notes. Salesmen told investors that their investments would be held in segregated accounts and would be refunded if the company had financial troubles. Naranjo prepared packets of information for the salesmen to send to potential investors. These packets contained, among other items, a business license from the City of Pelham, Alabama, a Wall Street Journal article that described the profitability of payday loan businesses, and a short biography of Carver that exaggerated his military record. A private placement memorandum informed

6

purchasers of bonds that about 16 percent of investor funds would cover overhead costs associated with the issuance of the bonds, but The Loan Shoppe did not make any such disclosure to the purchasers of promissory notes. Salesmen mailed the packets to potential investors and sometimes faxed additional information to investors. In return for their services, the salesmen received sales commissions of 15 or 20 percent.

Investors contributed $4,440,620 to Naranjo's capital investment campaign. This amount reflects investments from 139 investors in the United States and Colombia who provided capital contributions that ranged from $2,000 to $750,000. Investors either wired funds to the MRNA or The Loan Shoppe accounts or mailed checks payable to the companies. Even though MRNA dissolved eight months before the first investments arrived, the MRNA account received deposits of more than $1.5 million. Funds also were transferred from the Florida bank account of The Loan Shoppe to the MRNA account over two years after the dissolution of MRNA. Other funds that investors had contributed were transferred from the MRNA account to the Florida bank account of The Loan Shoppe.

Despite Naranjo's ability to obtain millions of dollars from investors, The Loan Shoppe was a failure. The Loan Shoppe, during its two years of existence,

earned only $506,876 in operating income. This income did not cover amounts The Loan Shoppe paid customers through check cashing and loans, and the business suffered an operational loss of $64,444.09, excluding payroll, insurance, and other overhead expenses.

The investors did not finance the expansion of a legitimate business, but instead funded a Ponzi scheme, which covered the considerable overhead expenses of The Loan Shoppe and enriched Carver and Naranjo. The Loan Shoppe used $1,346,573.49—approximately 30 percent of its capital contributions—to pay interest to investors or return investments. The Loan Shoppe spent another $1,060,864.19—approximately 24 percent of its capital contributions—to pay commissions to its salesmen. The Loan Shoppe also spent $381,586.91 on payroll expenses and $896,299.84 on general business expenses. Carver received more than $50,000 and Naranjo received a total of $450,531.08. Naranjo's receipts included funds from the accounts of The Loan Shoppe and MRNA that Naranjo had diverted to another business venture called Advance America and funds that Naranjo had paid directly to his personal creditors. Naranjo paid his landlord $24,000 for one year of rent, $32,431.04 toward the purchase of a new BMW car, and $22,000 for dental work, all from funds deposited by investors in MRNA.

Naranjo also made three large cash withdrawals from MRNA and The Loan

8

Shoppe accounts that corresponded with deposits from investors. On March 21, 2003, an investor deposited $15,000 into the MRNA account. Three days later, Naranjo cashed a $5000 check drawn on the MRNA account. MRNA received a total of $6500 from investors on March 25, 2003, and March 27, 2003. On March 28, 2003, Naranjo cashed a $6000 check drawn from the MRNA account. On November 18, 2003, an investor deposited $30,000 into the Florida account of The Loan Shoppe. That same day, Naranjo cashed a $20,000 check drawn from that account.

The investors in The Loan Shoppe did not fare as well as Naranjo. Although The Loan Shoppe paid a considerable portion of its funds to investors, most investors did not receive the interest payments that Naranjo and his salesmen had promised. In April 2004, after receiving a complaint from a Michigan investor who had not received his promised interest payments, Special Agent Christopher Young of the Alabama Securities Commission began investigating The Loan Shoppe. Young eventually received complaints from about 20 investors. Young learned that The Loan Shoppe was cashing checks without a license, but he did not warn investors to withdraw their investments. He turned his investigation over to Florida authorities after determining that no Alabama citizens had invested in The Loan Shoppe.

A series of events in late 2004 and early 2005 marked the downfall of The Loan Shoppe. In November 2004, The Loan Shoppe dissolved, but Carver revoked the dissolution the following month. On November 29, 2004, Naranjo incorporated another business in Florida, Advance America, Inc., and named himself the agent, incorporator, and president of the new corporation. In December 2004, two checks drawn on the Wachovia account of The Loan Shoppe, both for amounts exceeding $20,000, were made for the benefit of Advance America. On January 5, 2005, Naranjo resigned as president of Advance America. On January 26, 2005, The Loan Shoppe mailed investors a letter, purportedly signed by Carver, but not written by him, that stated that The Loan Shoppe had become the victim of "a corporate identity thief" when another company solicited investments under the same name. In the spring of 2005, federal authorities ceased operation of The Loan Shoppe. In May 2005, Agent James Grunwald of the Federal Bureau of Investigation began to examine business records of The Loan Shoppe.

In 2006, a federal grand jury indicted Naranjo and Carver on one count of conspiracy to commit mail fraud and wire fraud, 18 U.S.C. § 1349; seven counts of mail fraud, id. §§ 2, 1341; three counts of wire fraud, id. §§ 2, 1343; one count of conspiracy to commit money laundering activity, id. § 1956(h); and nine counts of

10

promotional money laundering, id. §§ 2, 1956(a)(1)(A)(i). The grand jury also indicted Naranjo for three counts of concealment money laundering, id. §§ 2, 1956(a)(1)(B)(i), based on his three checks for cash from the MRNA and The Loan Shoppe accounts. The grand jury also indicted Naranjo on five counts of engaging in monetary transactions in property derived from specified unlawful activity, id. §§ 2, 1957. The grand jury indicted Carver for two counts of concealment money laundering, id. §§ 2, 1956(a)(1)(B)(i).

At Naranjo and Carver's trial, the government presented testimony from twenty-one witnesses, including former salesmen, investors in The Loan Shoppe, Grunwald, and Young. Carver took the stand in his defense, but Naranjo did not testify. During Grunwald's testimony, the government introduced charts that provided summaries of the financial transactions of The Loan Shoppe that were based largely on business records. Naranjo's lawyer objected on the ground that the charts should be used only for demonstrative purposes. The district court overruled the objection and allowed the charts to be introduced as summary evidence.

During Young's testimony, Naranjo requested, under the Jencks Act, id. § 3500, any reports Young had prepared during his investigation. Young, who was employed in Nevada at the time of the trial, had prepared a closing memorandum

11

upon the termination of his investigation, but he no longer had access to it because it was in the possession of Alabama authorities. Young further testified that he had not given the memorandum to federal authorities, and the prosecutor stated that federal authorities did not have possession of any memorandum prepared by Young. The district court found that the requested documents were not in the possession of federal authorities and denied Naranjo's motion.

The jury convicted Naranjo of one count of conspiracy to commit mail and wire fraud, six counts of wire fraud, three counts of mail fraud, one count of conspiracy to commit money laundering, five counts of promotional money laundering, three counts of concealment money laundering, and five counts of engaging in monetary transactions with property derived from criminal activity. The jury acquitted Naranjo of one count of wire fraud and four counts of promotional money laundering. The jury acquitted Carver of all charges. The district court granted Naranjo's motion to vacate his two conspiracy convictions on the ground that Naranjo's alleged co-conspirator, Carver, had been acquitted of all charges. Naranjo also moved to set aside his concealment money laundering conviction on the ground that the government had presented insufficient evidence to support the convictions, but the district court denied this motion. The district court later granted Naranjo's motion to dismiss his lawyer and to proceed pro se.

The district court held three sentencing hearings to address various pro se motions made by Naranjo. The district court denied, among other motions, Naranjo's multiple motions for acquittal or for a new trial that related to Young's testimony, including a motion that alleged that the government had failed to disclose the report prepared by Young in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Naranjo attached to another motion for a new trial based on newly discovered evidence a police report summary that stated that Florida officials had received information from Young and then shared this material with Grunwald. The district court also denied this motion.

Naranjo objected to the recommendation in his presentence investigation report to enhance his sentence based on the total number of investors and the total amount invested. Naranjo argued that investors who received payouts from The Loan Shoppe should not be included in the number of victims and that amounts returned to investors should not be included in the loss calculation. Agent Jonathan Ostroman of the Federal Bureau of Investigation examined Grunwald's reports and testified at sentencing that 30 investors were refunded their full investments. Ostroman testified that Naranjo had defrauded 109 investors of a total of $2,747,137.47. The district court accepted Ostroman's calculation even though Grunwald had testified at trial that he had not closely examined every

13

document he obtained from The Loan Shoppe and MRNA. The district court enhanced Naranjo's sentence based on findings that he defrauded between 50 and 250 investors, U.S. Sentencing Guidelines Manual § 2B1.1(b)(2)(B) (2005), and he caused a loss of more than $2.5 million but less than $7 million, id. § 2B1.1(b)(1)(J). The district court also applied an enhancement for Naranjo's leadership role in the criminal activity, id. § 3B1.1(c), and cited the extensive nature of Naranjo's criminal activity as an alternate basis for the enhancement, 18 U.S.C. § 3553(a)(1).

The sentencing guidelines provided a sentence range of 108 to 135 months of imprisonment. The district court sentenced Naranjo to 120 months of imprisonment for each offense and ordered that the sentences run concurrently. The district court also ordered Naranjo to serve concurrent three-year terms of supervised release on each conviction, to pay a special assessment of $2,200, to pay restitution of $175,478, and to forfeit $2.5 million.

## II.  STANDARDS OF REVIEW

Several standards of review govern this appeal. "We review a verdict challenged for sufficiency of the evidence de novo, resolving all reasonable inferences in favor of the verdict." United States v. Yost, 479 F.3d 815, 818 (11th Cir. 2007). "We cannot disturb the verdict 'unless no trier of fact could have found

14

guilt beyond a reasonable doubt.'" Id. at 818–19 (quoting United States v. Lyons, 53 F.3d 1198, 1202 (11th Cir. 1995)).  We review a denial of a motion for a new trial based on an alleged violation of Brady or the Jencks Act for abuse of discretion.  United States v. Isaac Marquez, 594 F.3d 855, 859–60 (11th Cir. 2010), cert. denied, 130 S. Ct. 3373 (2010).  We review the calculation of losses by the district court for clear error.  United States v. Woodard, 459 F.3d 1078, 1087 (11th Cir. 2006).  We review an argument made for the first time on appeal for plain error.  See United States v. Emmanuel, 565 F.3d 1324, 1333 (11th Cir. 2009), cert. denied, 130 S. Ct. 1032 (2009).

### III.  DISCUSSION

We divide our discussion in four parts.  First, we first discuss Naranjo's argument about the sufficiency of the evidence used to support his convictions.  Second, we discuss Naranjo's motion for a new trial based on alleged violations of the Jencks Act and Brady.  Third, we discuss Naranjo's arguments about the admission of summary evidence of financial records.  Fourth, we discuss Naranjo's argument that the district court clearly erred at sentencing when it based its findings on estimates of the number of victims and amount of loss.

*A.  Sufficient Evidence Supports Each of Naranjo's Convictions.*

Naranjo raises two arguments about the sufficiency of the evidence the

15

government presented to support his convictions. First Naranjo argues, for the first time on appeal, that the district court should have vacated all of his convictions because the government failed to prove that he intended to participate in a fraud. Second, Naranjo argues that the district court erred when it denied his motion for acquittal on the charges of concealment money laundering because the three checks for cash drawn from the MRNA and The Loan Shoppe bank accounts are insufficient evidence of concealment money laundering when his business required cash for its daily operations. Both of these arguments fail. We discuss each argument in turn.

1. The Record Supports a Finding That Naranjo Intended to Participate in a Fraud.

Naranjo argues that all of his convictions should be vacated because the evidence failed to support a factual finding that Naranjo intended to participate in a fraud, but we disagree. Naranjo contends that he operated a legitimate business that would have "flourished" if not for "Young and his misguided investigation and tactics that caused investors to demand refunds."

Proof of an intent to defraud is necessary to support Naranjo's mail and wire fraud convictions. 18 U.S.C. §§ 1341, 1343; United States v. Jennings, 599 F.3d 1241, 1250 (11th Cir. 2010). Proof of fraud also is necessary to support Naranjo's convictions for concealment money laundering, 18 U.S.C. § 1956(a)(1)(B)(i);

promotional money laundering, id. § 1956(a)(1)(A)(i); and engaging in monetary transactions in property derived from specified unlawful activity, id. § 1957. Proof of fraud is necessary because these crimes prohibit certain uses of illegal proceeds, and the government did not allege that Naranjo derived income from any illegal activities other than mail and wire fraud. "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009). "A jury may infer an intent to defraud from the defendant's conduct." Id. at 1301. Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud. See United States v. Navarro-Ordas, 770 F.2d 959, 966–67 (11th Cir. 1985).

The jury reasonably found that Naranjo intended to participate in a fraudulent scheme. Evidence presented at trial established that Naranjo operated a check cashing and payday loan business without a state license; mailed copies of a city business license to prospective investors because he did not have a state license for check cashing; hid his connection to the business by omitting his name on corporate records and license applications; told his salesmen that the business was "very profitable" when it did not generate a profit; invested only a small

17

portion of investor funds on expansion of The Loan Shoppe; promised high rates of return that few, if any, investors actually received; exaggerated Carver's military record to potential investors; spent a majority of investor funds on debt service and sales commissions without informing investors; and personally profited over $450,000 from a business that did not generate a profit.

The jury was entitled to reject any inference that The Loan Shoppe failed because Young warned investors to withdraw their investments, but even if we could evaluate the credibility of this defense, the record gives no support to Naranjo's argument. Young testified that he did not tell investors to request refunds of their investments and that he did not even communicate with investors who did not contact him first. The record supports the finding of the jury that Naranjo intended to participate in a fraud.

2.  The Record Establishes That Naranjo Purposefully Concealed the Source or Ownership of Funds.

Naranjo argues that his concealment money laundering convictions must be vacated because the government did not prove that he purposefully concealed funds, but we again disagree. The concealment money laundering statute prohibits financial transactions conducted for the purpose of concealing unlawfully obtained funds:

Whoever, knowing that the property involved in a financial transaction

18

represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (B) knowing that the transaction is designed in whole or in part–(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment . . . .

18 U.S.C. § 1956(a)(1). Wire fraud and mail fraud are both "specified unlawful activit[ies]" subject to the concealment money laundering statute. See id. §§ 1956(c)(7)(A), 1961(1)(B). Because Naranjo concedes that a financial transaction occurred and we have already concluded that the evidence supports a finding that Naranjo knowingly participated in a fraud, our discussion addresses only whether the government presented sufficient evidence to prove that Naranjo knew that a purpose of his transactions was to conceal the location, source, ownership, or control of the funds he obtained by fraud.

The government must present substantial evidence of purposeful concealment to support a conviction for concealment money laundering. United States v. Majors, 196 F.3d 1206, 1213 (11th Cir. 1999). The spending of illegal proceeds alone is insufficient to prove concealment money laundering. Id. This Court has provided a non-exhaustive list of examples of evidence that may support a finding that a defendant purposefully sought to conceal funds, which includes "[']structuring the transaction in a way to avoid attention; depositing illegal profits

19

in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; [and] a series of unusual financial moves cumulating in the transaction.[']" Id. at 1213 n.18 (quoting United States v. Garcia-Emanuel, 14 F.3d 1469, 1475–76 (10th Cir. 1994) (emphasis omitted)).

Naranjo argues that his transactions were not secretive or irregular because he signed and endorsed the pertinent checks and cashed these checks to provide working capital for the daily operations of The Loan Shoppe. Naranjo argues that his transactions were not complex arrangements structured to hide the source of the funds. To support his position, Naranjo relies on United States v. Johnson, where this Court held that a transfer of funds to a foreign bank account did not support a conviction for concealment money laundering. 440 F.3d 1286, 1293 & n.5 (11th Cir. 2006).

Naranjo's arguments fail. The government presented evidence that Naranjo hid his connection to the relevant bank accounts and made three large cash withdrawals from them. The record does not support Naranjo's argument that he made cash withdrawals to provide operating capital for The Loan Shoppe, and Johnson is distinguishable.

Efforts to "conceal . . . the ownership[] or the control" of illegal proceeds

20

constitute concealment money laundering. 18 U.S.C. § 1956(a)(1)(B)(i). This Court has held that evidence that a defendant placed or directed the deposit of illegal income into a bank account held by a third person or corporation and then received the benefit of those proceeds is sufficient to support a conviction of concealment money laundering. See, e.g., United States v. Miles, 290 F.3d 1341, 1356 (11th Cir. 2002); United States v. Thayer, 204 F.3d 1352, 1354–55 (11th Cir. 2000); United States v. Flynt, 15 F.3d 1002, 1005 n.7, 1007 (11th Cir. 1994). Similarly, payments by check from accounts held by third parties may support a finding of concealment money laundering because these transactions misrepresent the source of wealth and produce documentary evidence that "could mislead an investigator." Garcia-Emanuel, 14 F.3d at 1476–77. Transfers of illegal proceeds to an account held in the name of an individual doing business as a corporation do not support a finding of purposeful concealment. See United States v. Blankenship, 382 F.3d 1110, 1128–29 (11th Cir. 2004). The cashing by a defendant of checks payable to entities controlled by the defendant has been held to provide sufficient evidence of concealment money laundering because the use of the account may "cloak [a defendant's] activities with a semblance of legitimacy." See United States v. Hairston, 46 F.3d 361, 375 (4th Cir. 1995).

The jury reasonably found that Naranjo purposefully concealed the source or

21

ownership of funds he obtained fraudulently. The evidence establishes that Naranjo had tried to conceal his association with the relevant bank accounts and used these accounts to conduct unusual financial transactions. Naranjo directed the deposit of funds into bank accounts held by either MRNA or The Loan Shoppe, but none of these accounts bore Naranjo's name, either as an individual or as an individual doing business as MRNA or The Loan Shoppe. About a month after incorporation, Naranjo removed his name from corporate filings of The Loan Shoppe. Additionally, Naranjo dissolved MRNA over a year and a half before the relevant cash withdrawals, and Naranjo's use of a bank account of a nonexistent corporation provides further support that he sought to conceal his association with illegal proceeds.

Naranjo's signatory status on the accounts and signature on the checks that provide the bases of the concealment money laundering charges do not affect our conclusion that the record supports Naranjo's conviction. Unlike the situation in Blankenship, where the defendant placed his name on an account for anyone dealing with the account to see, 382 F.3d at 1128–29, Naranjo did not reveal his true relationship to the accounts by signing the checks for cash because The Loan Shoppe and MRNA could authorize anyone to sign checks drawn from the corporate account. This appeal is more analogous to the circumstances in Garcia-

22

Emanuel, 14 F.3d at 1476–77, and Hairston, 46 F.3d at 374–75, where our sister circuits upheld convictions of concealment money laundering based on evidence that the defendants signed checks that were drawn from bank accounts that were controlled by the defendants but did not bear the name of the defendants. The record establishes that Naranjo took efforts to hide his connection to the fraudulently obtained funds. It is irrelevant that Naranjo left enough evidence to allow a novice investigator to trace these cash withdrawals to Naranjo and his wire and mail fraud activities because the statute requires only that proceeds be concealed, not that they be concealed well.

Evidence that a defendant converted funds into a form that is more difficult to trace, easier to hide, or less suspicious may also support a conviction for concealment money laundering. We have upheld convictions for concealment money laundering or conspiracy to commit concealment money laundering where a defendant exchanged small-denomination bills for large-denomination bills, United States v. Farese, 248 F.3d 1056, 1060 (11th Cir. 2001); exchanged cash for jewelry, United States v. Seher, 562 F.3d 1344, 1365 (11th Cir. 2009); exchanged cash for cashier's checks, United States v. Starke, 62 F.3d 1374, 1377, 1384 (11th Cir. 1995); and invested income from drug sales into a legitimate business, United States v. Saget, 991 F.2d 702, 713 (11th Cir. 1993). Concealment money

laundering prosecutions frequently involve defendants who allegedly converted cash from illegal activities into less suspicious assets, but the opposite transaction may also constitute concealment money laundering. A fraudfeasor commits concealment money laundering by converting documented, yet illegally obtained, funds into cash for the purpose of impeding the tracing of the funds. "[A]lthough not dispositive, [evidence of cash withdrawals] does lend greater support to the jury's finding that the withdrawals were made with the intent to conceal the location of the funds for the simple reason that cash cannot be traced." United States v. Dvorak, 617 F.3d 1017, 1024 (8th Cir. 2010).

A reasonable jury could have inferred that Naranjo made cash withdrawals so that the funds could not be easily traced to their source. By converting funds into cash, Naranjo would have been able to spend illegal proceeds without leaving a paper trail connecting his purchases to his mail fraud and wire fraud. Evidence that Naranjo withdrew cash supports his concealment money laundering conviction. The jury had additional justification to convict Naranjo because he withdrew cash "within one week of the deposits" by investors and "the cash withdrawals were large." Id. Cash withdrawals of $5000, $6000, and $20,000 could suggest to a reasonable jury that Naranjo withdrew cash not merely to cover everyday expenses but to hide the source of the funds and his connection to them.

24

The timing of the withdrawals also provides "circumstantial evidence [of] intent of concealing the location of the funds." Id.

The record gives no support to Naranjo's argument that Carver's testimony established that Naranjo withdrew cash from the bank accounts to provide working capital for The Loan Shoppe stores. Carver testified that he would routinely "go to the bank, take out X amount of cash, [and] take it to the store" to "keep the check cashing stores funded with cash." No evidence established that Naranjo also cashed checks to supply cash for The Loan Shoppe. Carver testified that The Loan Shoppe closed its Florida stores by the late summer or early fall of 2003 and verified that "Naranjo never actually went to Alabama," but Naranjo made the $20,000 cash withdrawal from an account of The Loan Shoppe on November 18, 2003. Even if Naranjo presented evidence that established he used the cash for legitimate purposes, the correct inquiry is whether a reasonable jury could have convicted Naranjo of concealment money laundering, not whether Naranjo had a plausible and legitimate explanation for his three large cash withdrawals. The jury also was entitled to reject Carver's testimony. See United States v. Hasner, 340 F.3d 1261, 1272 (11th Cir. 2003). The jury's "finding [relating to credibility] is binding on this Court" as long as it is supported by sufficient evidence, United States v. Tate, 586 F.3d 936, 945 (11th Cir. 2009), cert. denied, 131 S. Ct. 634

25

(2010).

We also reject Naranjo's argument that <u>Johnson</u> demands reversal. In <u>Johnson</u>, we held that the transfer of funds from a corporate account to a foreign bank account did not support a conviction of concealment money laundering when the government had failed to present evidence that the transfer of funds to foreign bank accounts impeded the tracing of funds. 440 F.3d at 1293 & n.5. This appeal is distinguishable from <u>Johnson</u> because Naranjo did more than transfer money between bank accounts. He made large cash withdrawals, and a reasonable jury could have found that cash is more difficult to trace than funds transferred between bank accounts. <u>See</u> <u>Dvorak</u>, 617 F.3d at 1024. Naranjo also tried to conceal his ownership of the funds by hiding his association with the bank accounts.

*B. Naranjo's Jencks Act and <u>Brady</u> Arguments Fail.*

Naranjo alleges that Young prepared a report of his investigation and that the government violated both the Jencks Act, 18 U.S.C. § 3500, and <u>Brady</u>, 373 U.S. 83, 83 S. Ct. 1194, by refusing to provide this report to Naranjo. Naranjo contends that the correct remedy for the alleged violations of the Jencks Act and <u>Brady</u> is a new trial, and we construe his <u>pro se</u> motions as requests for such relief.

Naranjo's argument lacks merit. Naranjo fails to establish that the district court abused its discretion when it denied Naranjo's motion for acquittal or for a

26

new trial. Naranjo also fails to establish that federal authorities had possession of such a report as required by both the Jencks Act and Brady, or that the report would have been exculpatory and material as required under Brady.

Naranjo's argument that the district court abused its discretion when it denied his motions for a new trial based on an alleged Jencks Act violation fails because the record does not establish that federal authorities possessed the report prepared by Young. The Jencks Act provides that, on a defendant's motion, a district court shall "order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). "A statement is 'in the possession of the United States' for Jencks Act purposes if it is in the possession of a federal prosecutorial agency." United States v. Cagnina, 697 F.2d 915, 922 (11th Cir. 1983). Naranjo alleges that Young prepared a report that was included in investigative findings sent from Alabama authorities to Florida authorities and then to federal authorities, but the district court found that "the document in question [was] not in possession of the . . . federal prosecuting authorities."

The government also did not violate Brady because it did not possess any report prepared by Young. In Brady, the Court ruled that the Due Process Clause requires prosecutors to disclose "evidence favorable to an accused . . . where the

27

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196–97. "Three elements establish a Brady violation: (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice." Stephens v. Hall, 407 F.3d 1195, 1203 (11th Cir. 2005). "[M]ere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'" United States v. Jordan, 316 F.3d 1215, 1252 n.81 (11th Cir. 2003). As with the Jencks Act, Brady "applies only to information possessed by the prosecutor or anyone over whom he has authority." United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989). "A prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a Brady request for information regarding a government witness." Id.

Naranjo's argument fails for a second reason: Brady applies only to exculpatory and impeachment evidence, and Naranjo's argument that the report contains exculpatory information is, at best, speculative. Naranjo asserts that Young's report would be exculpatory because Young concluded that Naranjo did

28

not violate Alabama law, but this argument misconstrues the record. Young testified that he terminated the investigation as "a matter of resources" because no "residents of the State of Alabama were participants or had been allegedly harmed by The Loan Shoppe" and referred the matter to Florida authorities. Young did not testify about whether Naranjo violated Alabama law. Naranjo submitted a summary report, allegedly prepared by Florida investigators, that suggests that Florida authorities shared Young's investigative findings with Grunwald, but this report contains no evidence that any of Young's documents would be exculpatory.

Naranjo argues that United States v. Antone, 603 F.2d 566 (5th Cir. 1979), requires the government to disclose Brady material possessed by state investigators, but we disagree. Antone held that Brady required federal prosecutors to disclose the payment of a witness's attorney fees by a state when federal and state authorities "pooled their investigative energies to a considerable extent," id. at 569, and "the state investigators functioned as agents of the federal government under the principles of agency law," id. at 570. Knowledge of information that state investigators obtain is not imputed for Brady purposes to federal investigators who conduct a separate investigation when the separate investigative teams do not collaborate extensively. See Moon v. Head, 285 F.3d 1301, 1310 (11th Cir. 2002) (holding that knowledge obtained by investigators in

29

one state is not imputed to investigators that conduct a separate investigation in another state). Because Grunwald conducted a federal investigation separate from Young's investigation, the government did not possess Young's report for <u>Brady</u> purposes.

### C. Naranjo's Arguments About Summary Evidence Fail.

Naranjo argues for the first time on appeal that the admission of summary evidence violated his rights under the Due Process and Confrontation Clauses of the United States Constitution. Naranjo argues that the summary evidence that the government presented in charts was inaccurate and violated his right to due process. Naranjo also argues that the introduction of summary evidence deprived him of his Sixth Amendment right to challenge the accuracy of this evidence through cross-examination, as articulated in <u>Davis v. Alaska</u>, 415 U.S. 308, 94 S. Ct. 1105 (1974), and <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354 (2004), because the summary evidence concerned investments made by investors who did not testify.

Naranjo's due process argument fails. "[T]his Court will permit the use of summary charts incorporating certain assumptions 'so long as supporting evidence has been presented previously to the jury . . . and where the court has "made it clear that the ultimate decision should be made by the jury as to what weight

should be given to the evidence.""" United States v. Richardson, 233 F.3d 1285, 1294 (11th Cir. 2000) (alteration in original) (quoting United States v. Francis, 131 F.3d 1452, 1458 (11th Cir. 1997) (quoting United States v. Means, 695 F.2d 811, 817 (5th Cir. 1983))). "[W]here the defense has the opportunity to cross-examine a witness concerning the disputed issue and to present its own version of the case, 'the likelihood of any error in admitting summary evidence diminishes.'" Id. (quoting United States v. Norton, 867 F.2d 1354, 1363 (11th Cir. 1989)). The introduction of charts as summary evidence by the government was consistent with Richardson. The government admitted into evidence the checks and bank records on which the summary charts were based, and Naranjo cross-examined Grunwald and elicited an admission that the charts were based on some assumptions. The district court later instructed the jury to refer to the charts "only as an aid . . . and not for the truth." Naranjo did not suffer a violation of his right to due process.

Naranjo cites United States v. Alzate, 47 F.3d 1103 (11th Cir. 1995), in support of a second due process argument, but that decision is irrelevant to the issue at hand. In Alzate, we ordered a new trial due to a Brady violation. Id. at 1110–11. Naranjo does not argue that the government violated Brady by introducing summary evidence.

Naranjo's Confrontation Clause claim also fails. The Sixth Amendment

31

affords criminal defendants an opportunity to cross-examine witnesses who present testimonial evidence. Crawford, 541 U.S. at 68, 124 S. Ct. at 1374. A statement is testimonial if "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Id. at 52, 124 S. Ct. at 1364. See also United States v. Caraballo, 595 F.3d 1214, 1228 (11th Cir. 2010) (quoting United States v. Baker, 432 F.3d 1189, 1203 (11th Cir. 2005)). The district court admitted into evidence the bank records and checks that provided the basis for the summary charts without any objection from Naranjo. These bank records and checks were admissible under the business records exception to the hearsay rule, Fed. R. Evid. 803(6). Business records are not testimonial. Crawford, 541 U.S. at 56, 124 S. Ct. at 1367 (discussing "statements that by their nature were not testimonial—for example, business records"); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Feliz, 467 F.3d 227, 233–34 (2d Cir. 2006); United States v. Baker, 458 F.3d 513, 519–20 (6th Cir. 2006). Summary evidence also is not testimonial if the evidence underlying the summary is not testimonial. See United States v. Jamieson, 427 F.3d 394, 411–12 (6th Cir. 2005). Because the Confrontation Clause only provides a right to cross-examination of testimonial statements, the district court did not plainly err by admitting summary evidence based on bank records and checks.

32

*D. The District Court Did Not Err When It Enhanced Naranjo's Sentences Based on Estimates of the Number of Victims and Total Losses.*

Naranjo argues that the district court erred and imposed an unreasonable sentence when it enhanced Naranjo's sentence based on estimations of the number of victims and total amount of losses, but this argument fails. "For sentencing purposes, the loss amount does not need to be precise and may only be a reasonable estimate of the loss based on the available information." Woodard, 459 F.3d at 1087. Naranjo fails to cite any portion of the record that suggests that the district court accepted an erroneous estimate of the number of victims and total loss, nor does he contest the assertion of the government that Grunwald based his estimates largely on bank records. The record instead establishes that the district court rejected the loss calculation provided in the presentence investigation report and, based on Ostroman's testimony, lowered the loss estimate. The district court did not err when it relied at sentencing on estimates of the number of victims and amount of losses. Naranjo's sentence, within the guidelines range, is reasonable.

## IV. CONCLUSION

We **AFFIRM** Naranjo's convictions and sentence.