[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16843
_____

D.C. Docket No. 2:14-cr-00382-BJR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JONATHAN WADE DUNNING,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(July 10, 2018)

Before WILSON and JORDAN, Circuit Judges, and CONWAY,* District Judge.

PER CURIAM:

---

\* Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

Defendant Jonathan Wade Dunning was charged in a 112-count[1] indictment related to a fraudulent scheme to divert funds from two federally-funded community healthcare centers he had managed as chief executive officer. The indictment charged him with substantive and conspiracy counts to commit wire fraud, bank fraud, federal program fraud, and money laundering in violation of 18 U.S.C. §§ 2, 371, 666, 1343, 1344, 1349, 1956, and 1957. Dunning pleaded not guilty and his trial began on May 24, 2016.

At the close of the Government's case, and again at the close of all the evidence, Dunning unsuccessfully moved for judgments of acquittal. Following seventeen days of testimony, on June 17, 2016, the jury convicted Dunning on 98 of the 112 charged counts and he was sentenced to 216 months' imprisonment. Dunning appeals the convictions, arguing there was insufficient evidence presented at trial to support the jury's verdict.  After review of the record and with the benefit of oral argument, we AFFIRM.

## I. BACKGROUND

Dunning began his employment at Birmingham Health Center (BHC) in 1995 as clinical director, and became the chief executive officer in 1998. During

---

[1] Specifically, Counts 1-3 and 5-69 charged wire fraud in violation of 18 U.S.C. §§ 1343, 1349 and 2; Count 4 charged conspiracy to defraud an agency of the United States via wire fraud, bank fraud, and money laundering in violation of 18 U.S.C. § 371, and federal program fraud (18 U.S.C. § 666); Counts 70-72 charged bank fraud in violation of 18 U.S.C. §§ 1344 and 2; Counts 73-78 charged money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2; and Counts 79-112 charged money laundering in violation of 18 U.S.C. §§ 1957 and 2.

his tenure, BHC expanded the number of clinic locations, patients served, and revenue. Dunning additionally became the chief executive officer of Central Alabama Comprehensive Health (CACH) in 2005. Both community healthcare centers were non-profit organizations funded in part through federal grants from the United States Department of Health and Human Services, Health Resources & Services Administration ("HRSA"), to provide healthcare at no-cost or low-cost to homeless and economically disadvantaged populations.

After years of managing the centers, Dunning told others that he knew he was more "valuable" than the $290,000 annual salary he was being paid by the non-profits, and he had "found a way to make money off the government." Beginning in 2006, Dunning formed the first of several of his for-profit companies—each containing "Synergy" in the business name (collectively "the Synergy Entities")—which would subsequently take over the management duties of BHC and CACH as well as ownership of certain real estate used by BHC. Throughout the ensuing seven years, Dunning and the Synergy Entities had no other source of income, no other paying clients, and no other significant commercial real estate tenants other than BHC and CACH.

On October 31, 2008, Dunning left his employment with the community healthcare centers to focus on the operation of his for-profit Synergy Entities. However, Dunning retained management control over BHC and CACH through his

manipulation of the individuals he handpicked to succeed him as chief executive officer at the centers. Jimmy Lacey, who succeeded Dunning at BHC, lacked the appropriate experience in healthcare and was unemployed at the time he was selected; Lacey was an unindicted coconspirator who died six months before trial.[2]

The chief financial officer, Terri Mollica, and the lead grant-writer, Sharon Waltz, both left BHC with Dunning to work at the Synergy Entities although they continued to perform the same duties and continued to direct employees at BHC.[3] Despite leaving BHC, Mollica maintained her access to both centers' federal grant funding accounts. Mollica was indicted separately and entered into a plea agreement in her case in April 2015; however, she refused to testify at Dunning's trial.

Dunning also continued his influence over the BHC controller, Sheila Parker, who remained employed at BHC, and managed (with Lacey) the affiliated Birmingham Financial Federal Credit Union (the "Credit Union"), which primarily served employees of BHC. Parker subsequently pleaded guilty to embezzling money from CACH's bank account, and testified at Dunning's trial.

---

[2] Dunning's successor at CACH, Alan Yoe, testified that he did not feel capable of doing the job and he had previously received a "very poor" performance review; Dunning remarked that he believed Yoe "could not get the job done." No criminal charges were filed against Yoe.

[3] Sharon Waltz was Dunning's romantic partner and had two children with him. Waltz was an unindicted coconspirator.

Over the course of several years, Dunning used his control over BHC and CACH to divert $13.5 million to his for-profit Synergy Entities through consulting contracts, real estate leases, and transfers from BHC's revenue account containing federal grant funds. The Synergy Entities' main source of rental income of approximately $4 million was primarily from leases negotiated with Lacey on behalf of BHC. Through Dunning's fraudulent activities, he engineered the transfer of ownership to his Synergy Entities of two buildings housing BHC clinics, paying half of its appraised value for one building's purchase from BHC, and using BHC funds to pay the full purchase price from a third-party for the other building. Dunning used BHC funds to pay three-years worth of the debt service on a third building to be renovated for a BHC clinic; however, Dunning never renovated the property as promised, diverting the renovation loan funds to a separate property he owned, and keeping all of the profits from its eventual sale when BHC could not open a clinic. Because Dunning remained in control of the management of BHC and CACH, he diverted funds from the centers' federal grants and BHC's clinic operating account into his personal account, and used BHC funds to make payments on the loan for a new $85,000 Jaguar. Dunning also defrauded a business partner out of the proceeds in a joint venture performing work for BHC by diverting the full payments to his Synergy Entities and denying BHC had paid.

5

To disguise his fraudulent activities from an investigator at HRSA, Dunning directed Lacey and others to provide false information about payments from BHC to the Synergy Entities. Through the course of their multi-year relationship with Dunning's Synergy Entities, the community healthcare centers suffered significant financial problems which eventually forced BHC to the brink of bankruptcy and CACH to close its doors for good.

## II. DISCUSSION

### A.

Dunning challenges the sufficiency of the evidence to sustain his convictions. We review the sufficiency of evidence to support a conviction *de novo* while viewing the evidence in the light most favorable to the government and resolving all credibility evaluations in favor of the jury's verdict. *United States v. Hernandez*, 743 F.3d 812, 814 (11th Cir. 2014) (per curiam). A jury's verdict must stand "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013). It is unnecessary for the government "to disprove every reasonable hypothesis of innocence, as the jury is free to choose among reasonable constructions of the evidence." *United States v. Mieres–Borges*, 919 F.2d 652, 656 (11th Cir. 1990).

"The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." *United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011) (quotation omitted). However, "[w]here the government relies on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict." *Id.* (quotations omitted). "To the extent that [the defendant's] argument depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and the court of appeals may not revisit this question." *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999).

## B.

Dunning was convicted of multiple counts of substantive and conspiratorial criminal conduct to defraud a federal agency, 18 U.S.C. § 371, based on wire fraud, bank fraud, money laundering, and federal program fraud. "A conspiracy is an agreement between two or more persons to accomplish an unlawful plan." *United States v. Chandler*, 388 F.3d 796, 805 (11th Cir. 2004). To sustain a conspiracy conviction based on fraud in violation of 18 U.S.C. § 371, the Government was required to prove (1) an agreement between Dunning and at least one other person to commit an offense against or defraud the United States; (2) Dunning's knowing and voluntary participation in the agreement; and (3) the

7

commission of an act in furtherance of the agreement. *See United States v. Tampas*, 493 F.3d 1291, 1298 (11th Cir. 2007); *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003); 18 U.S.C. § 371. "The knowledge requirement is satisfied when the [g]overnment shows a defendant's awareness of the essential nature of the conspiracy." *United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th Cir. 2006).  "[T]he defendant's assent can be inferred from acts which furthered the conspiracy's purpose." *United States v. Miller*, 693 F.2d 1051, 1053 (11th Cir. 1982) (quotation omitted).

In order to convict someone of fraudulently obtaining or misapplying funds from an organization receiving federal assistance, the Government must prove: (1) the defendant converted property owned by, or under the care, custody, or control of an organization receiving federal assistance; (2) the defendant was an agent of such an organization; (3) that property was valued at $5,000 or more; and (4) the organization received in excess of $10,000 in federal funds during the one-year period in which the defendant converted the property. 18 U.S.C. § 666(a)-(b); *see Tampas*, 493 F.3d at 1298. The statute defines an "agent" as one who is "authorized to act on behalf of another" and, "in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1); *United States v. Langston*, 590 F.3d 1226, 1233–34 (11th Cir. 2009).

To sustain Dunning's convictions for wire fraud, 18 U.S.C. § 1343, the Government must prove beyond a reasonable doubt that he intentionally participated in an unlawful "scheme to defraud" and used the interstate wires to carry out that scheme. *United States v. Langford*, 647 F.3d 1309, 1320 (11th Cir. 2011) (describing the elements of wire fraud in violation of 18 U.S.C. § 1343). To prove bank fraud under 18 U.S.C. § 1344, the Government must show beyond a reasonable doubt that the defendant intentionally engaged in a scheme or artifice to defraud, or made materially false statements or representations to obtain moneys, funds or credit from a federally insured financial institution. *United States v. De La Mata*, 266 F.3d 1275, 1298 (11th Cir. 2001) (setting forth the elements for bank fraud, 18 U.S.C. § 1344). Proof of fraud also is necessary to sustain Dunning's convictions for money laundering.[4] *See United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011).

"A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citation omitted). "A misrepresentation is material if it has 'a natural

---

[4] The indictment charged violations of the money laundering statutes which prohibit use of illegal proceeds from the other crimes alleged in the indictment. *See Naranjo*, 634 F.3d at 1207 (citing 18 U.S.C. §§ 1956(a)(1)(A)(i) (promotional money laundering); *id.* § 1956(a)(1)(B)(i) (concealment money laundering); *id.* § 1957 (engaging in monetary transactions in property derived from specified unlawful activity)). As Dunning concedes, the money laundering convictions are derivative of the wire fraud and bank fraud counts in this case.

tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed.'" *Id*. (quoting *Hasson*, 333 F.3d at 1271). We frequently have noted that "direct evidence of an agreement is unnecessary; the existence of the agreement and a defendant's participation in the conspiracy may be proven entirely from circumstantial evidence." *United States v. McNair*, 605 F.3d 1152, 1195 (11th Cir. 2010). "Because conspiracies are secretive by nature, the jury must often rely on 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'" *United States v. Martin*, 803 F.3d 581, 588 (11th Cir. 2015) (quoting *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013)).

## C.

Viewed in the light most favorable to the government and the jury's verdict, the evidence sufficiently established that Dunning knew of and voluntarily joined a long-running conspiracy and actively participated in siphoning millions of dollars out of BHC and CACH consisting of the federal grant funds provided by HRSA; by manipulating BHC's account at the Credit Union; and by making material misrepresentations to his business partner in a billing service for BHC. A reasonable jury could find that while still chief executive officer of BHC, Dunning and Lacey misrepresented the value of the BHC headquarters building in convincing the BHC board to sell it to a Synergy Entity. Dunning and Mollica

diverted grant funds from BHC's federal grant funds to purchase a second building held in the name of a Synergy Entity, and Dunning used BHC funds to pay the debt service on a third building which he failed to renovate and eventually sold, keeping the entire profit. Dunning directed Parker to move BHC's revenue account to the affiliated Credit Union in order to manipulate and conceal transfers into his personal account and transfers to pay for his new Jaguar.

The evidence was sufficient for the jury to find that Dunning misrepresented to HRSA in grant applications prepared by Waltz that BHC and CACH would provide thousands of expensive chip-enabled "smart cards" to clients in emergency preparedness kits, instead supplying inexpensive paper business cards that cost pennies. The centers' contracts with Synergy Entities were intentionally concealed from HRSA. Dunning misled his business partner, telling him BHC was not paying for the billing work provided by their joint business, when in reality Dunning had directed others to send BHC's payments to a Synergy Entity so he could pocket the full amount. Dunning directed others in misrepresenting and omitting information from BHC's response to an investigation by the HRSA Financial Integrity Division in order to conceal their conspiracy. The jury was entitled to draw the reasonable inference that Dunning knew of and voluntarily participated in the fraudulent scheme to "make money off the government" by diverting federal grant funds from the non-profit healthcare centers.

11

In February 2008, six months before Dunning left BHC, he orchestrated the sale of BHC's headquarters, the Plaza Building, for $2.8 million to a Synergy Entity, who leased it back to BHC following the sale. Although serving as BHC's chief executive officer at the time, Dunning did not apprize BHC's board of directors that an earlier appraisal from September 26, 2007 had valued the Plaza Building at $6 million.[5] Within two days of the $6 million appraisal's completion, on September 28, 2007, Dunning paid $25,000 to Lacey, chairman of the BHC board at that time. Less than a month later, and just two days before incorporating a Synergy Entity as a real estate holding company, on October 23, 2007, Lacey sent an email to Dunning entitled "For the Record" which read: "Just a reminder, 'Our collaboration is a conspiracy that is essential to our success!'"[6] (Three years

---

[5] The September 26, 2007 appraisal was performed for a potential bank loan to finance the transfer of ownership from BHC to a Synergy Entity and the $6 million value was built on the income approach with a "triple net" lease. A January 2008 appraisal valued the Plaza Building at $3.2 million based on the income approach where expenses were paid by the landlord. The difference in the appraised values was attributable to the difference in costs expected to paid by the tenant; the evidence established that, if the January 2008 appraisal had been conducted under an assumption that the tenant would pay those costs, the value for the Plaza Building would have been approximately $5.5 million.

[6] Dunning argues the district court erred in admitting the email because it was not properly authenticated. However, Dunning stipulated to the authenticity of Lacey's emails at the pretrial conference; therefore, he cannot appeal the issue of authenticity. *Ponderosa Sys., Inc. v. Brandt*, 767 F.2d 668, 670 (10th Cir. 1985) (holding where plaintiff had stipulated to authenticity of records at trial, defendant was not required to introduce evidence authenticating the records). The district court admitted Lacey's email as a statement in furtherance of the conspiracy and, therefore, outside the hearsay exclusion. *See* Fed.R.Evid. 801(d)(2)(E) (statements made by a co-conspirator "during and in furtherance of the conspiracy" are not hearsay). Once the email was admitted, "the ultimate question of authenticity [was] then decided by the jury." *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012). To the extent Dunning argues the district court erred in excluding evidence of an industry magazine called "For The Record" on grounds of relevance, we find the error to be harmless given the "overwhelming evidence" of Dunning's

later, Dunning subsequently obtained a new bank loan based in substantial part on $1.3 million in the equity from the Plaza Building.)

Members of the BHC board had expressed a willingness to sell the Plaza Building to Dunning in order to reduce BHC's monthly operating expenses and increase its cash flow. However, Lacey committed BHC to a triple-net lease obligating it to pay for all taxes, insurance, and maintenance fees for the entire property, which amounted to *more* than BHC's previous mortgage payment. In addition, by foregoing ownership of the Plaza Building, BHC lost any equity it had accumulated in the property and any rental income from the other tenants.

Dunning also diverted BHC's grant funds to the purchase of a second building, the Norwood Building, for his own benefit. In late 2009, after Dunning had already contracted for a Synergy Entity to buy the Norwood Building from a third party, Dunning found out he would not receive the bank financing in time to close the deal before the purchase contract expired. Dunning then directed Terri Mollica, the Synergy employee who continued to have access to BHC's financial accounts, to make three transfers totaling $1.1 million from BHC's accounts to the third-party seller's closing agent in Texas to complete the purchase on time. Ownership of the Norwood Building was nonetheless conveyed to Dunning's Synergy Entity who was listed as the purchaser. BHC Board members testified

---

guilt as set forth in the text. *See United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010).

they had no knowledge of the transfers to purchase the Norwood Building.[7] Once the purchase closed, Lacey signed a ten-year lease for BHC to pay rent of $18,750 per month for the Norwood Building even though BHC's own funds had been used to purchase the property.

Although BHC had paid $1.1 million to purchase the Norwood Building, in March 2010, Dunning represented the Synergy Entity as the building owner to a new lender and subsequently refinanced the property, borrowing $850,000 against the equity in the Norwood Building. Three months later he used the Norwood Building as collateral for a $300,000 line-of-credit. Dunning did not return to BHC the $1.1 million transferred for the purchase; instead, he deposited the money from the re-finance into his Credit Union account, labeling it as his money.

In January 2010, another Synergy Entity purchased a third property, the 2030 Building, which Dunning intended to renovate and lease to BHC to operate a new clinic location. Despite BHC paying the full $353,000 to service the debt on the mortgage for three years, BHC was never able to move into the building because it was not sufficiently renovated by Dunning, who was supposed to fund

---

[7] We find no error in the district court's admission of the grand jury testimony of the BHC auditor regarding the five-year delay in determining that a BHC receivable (for $652,000) was connected to the Norwood Building purchase and not a "normal trade account." The Government introduced the auditor's prior inconsistent statement on cross-examination when he testified at trial "he could not conclude" BHC's grant funds had been misused. Fed. R. Evid. 801(d)(1)(A) (hearsay excludes a testifying declarant's prior statement if it was inconsistent with the current testimony and was given under penalty of perjury at a trial, hearing, or other proceeding).

the renovation. When Dunning sold the 2030 Building in September 2013 without finishing the restorations, he kept all of the profit from the sale for himself even though BHC had paid the debt service for three years.

D.

Dunning was also able to divert funds from the centers' federal grants because Sharon Waltz, who had moved to the Synergy Entities, remained the lead grant-writer for the centers. In September 2009, BHC and CACH each received a $331,000 federal grant from the HRSA for 3,000 emergency preparedness kits to be provided free to patients. Although the grant applications prepared by Waltz represented that there would be no contractual expenses, in October 2009, Dunning's Synergy Entities subcontracted with the centers to produce the kits. A significant portion of the cost of each kit was for a "smart card" which would look like a credit card with an electronic chip containing the patient's medical information, valued at $50 each, along with technical support. Synergy never provided the chip-enabled smart cards or system support, substituting instead paper cards worth 18 cents a piece, and HRSA was never informed of the change. Instead of giving the kits away for free to patients as represented in the centers' HRSA grants, Dunning directed that they should be sold for $79.95 each, and thousands of undistributed kits remained at the centers years later.

15

Dunning was able to divert funds from BHC's financial accounts in his role as president of the Credit Union, which was primarily for the benefit of BHC employees. It was such a small operation, however, that the Credit Union kept its deposits in a single account at a commercial bank, and tracked deposits through an internal accounting system. In September 2010, Dunning directed the BHC controller, Sheila Parker, who co-managed the Credit Union with Lacey, to stop depositing BHC's clinic revenue at the commercial bank, and begin depositing BHC's revenue into an operational account at the Credit Union. Soon after creating the BHC revenue account at the Credit Union, Dunning directed Parker to transfer substantial amounts out of the BHC revenue account into Dunning's personal Credit Union account. A year later, Dunning had the name on his personal Credit Union account changed to "BHC Revolving Credit Line," although no "credit line" appeared on BHC's financial records. When BHC staff or external accountants tried to make sense of the credit union transfers between BHC's revenue account and Dunning's personal account, Dunning always insisted BHC owed him more or directed them to "zero out" the excess amount BHC had overpaid him. Dunning also made sure the accountants were not given access to checks BHC made payable to Dunning and the Synergy Entities, preventing a full and accurate accounting.

16

When Dunning purchased an $85,000 Jaguar in July 2010, he used his influence over the Credit Union management to obtain a loan for 100% of the purchase price without a loan application, credit check, or approval from the Credit Union board. Although national examiners flagged the loan as an "exception," Dunning, Lacey, and Parker created loan application documents after-the-fact in an attempt to avoid further scrutiny. Dunning subsequently directed Parker to take the payments for the Jaguar loan from BHC's account. Eventually, in late 2011, national examiners determined the Credit Union was insolvent and closed it.

Dunning also diverted funds from his partner, Jayson Meyer, in a joint venture Dunning formed in late 2008 with Meyer's company, WorkSmart MD, which had been providing billing services to BHC since 2006. Dunning instructed BHC to start sending the payment checks for the billing services to the Synergy Entity, and no longer directly to Meyer. Once Dunning took over this arrangement, the payments to Meyer—whose employees were the ones actually performing the work—became sporadic and delayed. Meyer learned belatedly in 2013 that Dunning had signed contracts on behalf of the joint venture to provide additional services—which Meyer's company had been providing to BHC all along. However, payments from BHC for the original and additional services were going to Dunning, who had been keeping Meyer's portion of the payments while blaming BHC for the "delays."

17

At some point in late 2010, an accountant in the Financial Integrity Division of HRSA, Valerie Holm, received a citizen complaint about BHC's expenditures and began investigating payments made by BHC to a Synergy Entity. Ms. Holm emailed Terri Mollica, Sharon Waltz, and Jimmy Lacey to request information about BHC's relationship with the Synergy Entities. Dunning directed Lacey to respond to HRSA with false and misleading information, including redacted contracts with the Synergy Entities and altered board meeting minutes from February 2008 which concealed Dunning's purchase of the Plaza Building from BHC while he was still chief executive officer. Dunning also told Lacey to misrepresent the status of the chief financial officer (Mollica), who had become a Synergy employee in late 2008 but had retained her control over BHC's federal grant accounts. Dunning directed Lacey to withhold the check registers HRSA had expressly requested as part of the investigation into BHC's expenditures of grant funds. Eventually, as the financial problems at the centers continued to mount, they were forced to lay off employees and delay payments for medicine, equipment, supplies, all the while following Dunning's demand to "pay Synergy first."

### III. CONCLUSION

Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict, the evidence established that Dunning knew of and voluntarily joined the conspiracy and that

18

Dunning actively participated in the fraud related to purchases of the Norwood, Plaza, and 2030 Buildings; siphoning of BHC funds at the Credit Union; lying to Meyer about BHC's payments for billing work; and misrepresentations and omissions made to HRSA regarding federal grant fund expenditures. Thus, based upon the totality of the evidence presented, we conclude that the district court did not err in denying Dunning's motion for judgments of acquittal: sufficient evidence allowed a reasonable jury to conclude that Dunning was guilty of the charged conspiracy and wire fraud, bank fraud, federal program fraud, and money laundering offenses, beyond a reasonable doubt. Accordingly, we affirm Dunning's convictions.

**AFFIRMED**.