[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15331

_____

D.C. Docket No. 1:09-cr-21010-JEM-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOEL ESQUENAZI,
CARLOS RODRIGUEZ,

Defendants - Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(May 16, 2014)

Before MARTIN, JORDAN and SUHRHEINRICH,[*] Circuit Judges.

MARTIN, Circuit Judge:

---

[*] Honorable Richard F. Suhrheinrich, United States Court of Appeals for the Sixth Circuit, sitting by designation.

Joel Esquenazi and Carlos Rodriguez appeal their convictions and sentences imposed after a jury convicted them of conspiracy, violating the Foreign Corrupt Practices Act, and money-laundering. After careful review, and with the benefit of oral argument, we affirm.

I.

In December 2009, a grand jury indicted Messrs. Esquenazi and Rodriguez on 21 counts. Two of these were conspiracy charges that spanned November 2001 through March 2005: conspiracy to violate the Foreign Corrupt Practices Act (FCPA) and commit wire fraud, all in violation of 18 U.S.C. § 371 (Count 1); and conspiracy to launder money, in violation of 18 U.S.C. § 1956 (Count 9). Counts 2 through 8 charged substantive violations of the FCPA, 15 U.S.C. § 78dd-2. And Counts 10 through 21 charged acts of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

A.  Trial[1]

Messrs. Esquenazi and Rodriguez co-owned Terra Telecommunications Corp. (Terra), a Florida company that purchased phone time from foreign vendors and resold the minutes to customers in the United States. Mr. Esquenazi, Terra's majority owner, served as President and Chief Executive Officer. Mr. Rodriguez,

_____

[1] The facts relevant only to the challenges to the sufficiency of the evidence are recited in the light most favorable to the jury's verdict. United States v. Pacchioli, 718 F.3d 1294, 1299 (11th Cir. 2013).

the company's minority owner, served as Executive Vice President of Operations. James Dickey served as Terra's general counsel and Antonio Perez as the company's comptroller.

One of Terra's main vendors was Telecommunications D'Haiti, S.A.M. (Teleco). Because the relationship of Teleco to the Haitian government was, and remains, at issue in this case, the government presented evidence of Teleco's ties to Haiti. Former Teleco Director of International Relations Robert Antoine testified that Teleco was owned by Haiti. An insurance broker, John Marsha, testified that, when Messrs. Rodriguez and Esquenazi were involved in previous contract negotiations with Teleco, they sought political-risk insurance, a type of coverage that applies only when a foreign government is party to an agreement. In emails with Mr. Marsha copied to Messrs. Esquenazi and Rodríguez, Mr. Dickey called Teleco an "instrumentality" of the Haitian government.

An expert witness, Luis Gary Lissade, testified regarding Teleco's history. At Teleco's formation in 1968, the Haitian government gave the company a monopoly on telecommunication services. Teleco had significant tax advantages and, at its inception, the government appointed two members of Teleco's board of directors. Haiti's President appointed Teleco's Director General, its top position, by an executive order that was also signed by the Haitian Prime Minister, the minister of public works, and the minister of economy and finance. In the early

3

1970s, the National Bank of Haiti gained 97 percent ownership of Teleco. From that time forward, the Haitian President appointed all of Teleco's board members. Sometime later, the National Bank of Haiti split into two separate entities, one of which was the Banque de la Republique d'Haiti (BRH). BRH, the central bank of Haiti, is roughly equivalent to the United States Federal Reserve. BRH retained ownership of Teleco. In Mr. Lissade's expert opinion, for the years relevant to this case, Teleco belonged "totally to the state" and "was considered . . . a public entity."

Mr. Lissade also testified that Teleco's business entity suffix, S.A.M., indicates "associate anonymous mixed," which means the "Government put money in the corporation." Teleco's suffix was attached not by statute, but "de facto" because "the government consider[ed] Teleco as its . . . entity." In 1996, Haiti passed a "modernization" law, seeking to privatize many public institutions. As a result, Haiti privatized Teleco sometime between 2009 and 2010. Ultimately, Mr. Lissade opined that, during the years relevant to this case, "Teleco was part of the public administration." He explained: "There was no specific law that . . . decided that at the beginning that Teleco is a public entity but government, officials, everyone consider[ed] Teleco as a public administration." And, he said, "if there was a doubt whatsoever, the [anti-corruption] law [that] came in 2008 vanish[ed] completely this doubt . . . by citing Teleco as a public administration" and by

4

requiring its agents — whom Mr. Lissade said were public agents — to declare all assets to avoid secret bribes.

In 2001 Terra contracted to buy minutes from Teleco directly.  At that time, Teleco's Director General was Patrick Joseph (appointed by then-President Jean-Bertrand Aristide), and the Director of International Relations was Robert Antoine.  Mr. Antoine had two friends and business associates who played a role in this case: Jean Fourcand, a grocery-store owner, and Juan Diaz.

By October 2001, Terra owed Teleco over $400,000.  So Mr. Perez testified, Mr. Esquenazi asked him to contact Mr. Antoine and negotiate an amortization deal or, alternatively, to offer a side payment.  Mr. Perez met with Mr. Antoine, who rejected the idea of amortization but agreed to a side payment to ease Terra's debt.  The deal, according to Mr. Perez, was that Mr. Antoine would shave minutes from Terra's bills to Teleco in exchange for receiving from Terra fifty percent of what the company saved.  Mr. Antoine suggested that Terra disguise the payments by making them to sham companies, which Terra ultimately did.  Mr. Perez returned to Mr. Esquenazi and told him the news and later shared details of the deal in a meeting with Messrs. Esquenazi, Rodriguez, and Dickey.  The four discussed "the fact that Robert Antoine had accepted an arrangement to accept . . . payments to him in exchange for reducing [Terra's] bills."  Mr. Perez testified:

"[Mr. Esquenazi] was happy, and both James Dickey and Carlos Rodriguez also congratulated me on a job well done."[2]

The following month, in November 2001, Terra began funneling personal payments to Mr. Antoine using the following subterfuge. Mr. Dickey, on Terra's behalf, drafted a "consulting agreement" between Terra and a company Mr. Antoine had suggested called J.D. Locator. J.D. Locator, an otherwise insolvent company, was owned by Mr. Antoine's friend Juan Diaz. During the course of the next several months, Messrs. Rodriguez and Esquenazi authorized payments to J.D. Locator via "check requests," forms Terra used to write checks without invoices. Mr. Diaz testified that he knew the payments Terra made were not for legitimate consulting services and that he never intended to provide such services. Instead, Mr. Diaz retained ten percent of the funds Terra paid J.D. Locator and disbursed the remainder, usually either to Mr. Antoine or his business associate Mr. Fourcand. Mr. Fourcand testified that he knew he was receiving money from Terra (through J.D. Locator) that would ultimately go to Mr. Antoine and that Mr. Antoine asked him to be part of that deal. All told, while Mr. Antoine remained at Teleco, Terra paid him and his associates approximately $822,000. And, during that time, Terra's bills were reduced by over $2 million.

---

[2] Mr. Perez was fired by Terra in January 2002.

In April 2003, President Aristide removed Mr. Antoine and named Alphonse Inevil as his replacement. Mr. Inevil soon replaced Mr. Joseph as Director General, and Jean Rene Duperval replaced Inevil. Later that year, with Terra still behind on its bills, Mr. Esquenazi helped Mr. Duperval form a shell company, Telecom Consulting Services Corporation (TCSC), through which Esquenazi ultimately would make side payments to Mr. Duperval. TCSC's president was Margurite Grandison, Mr. Duperval's sister; its incorporator and registered agent was Mr. Dickey; and the company's principal business address was a post office box that named Mr. Duperval as the person empowered to receive mail through it. Ms. Grandison executed a "commission agreement" with Terra, which Mr. Esquenazi signed. And on November 20, Mr. Rodriguez authorized the first transfer, $15,000, to TCSC. Over the next five months, although Terra received no invoices to reflect money owed TCSC, Terra made six additional transfers to TCSC totaling $60,000. Each of these seven transfers is the subject of the substantive FCPA counts. Ms. Grandison then disbursed money from TCSC's account to Mr. Duperval and his associates. She made a number of transfers, twelve of which constitute the substantive money-laundering counts.

During the Internal Revenue Service's investigation of the case, Mr. Esquenazi admitted he had bribed Mr. Duperval and other Teleco officials. He and

7

Mr. Rodriguez nonetheless pleaded not guilty, proceeded to trial, and were found guilty on all counts.[3]

B.  Post-trial

Five days after the jury convicted Messrs. Esquenazi and Rodriguez, the government received from an attorney involved in Patrick Joseph's defense a declaration by the Haitian Prime Minister, Jean Max Bellerive.  The declaration, marked with a date that fell in the middle of the jury trial, stated:  "Teleco has never been and until now is not a State enterprise."  In a second declaration, made later and provided by the government to defense counsel, Prime Minister Bellerive confirmed that "the facts mentioned in the [first] statement are truthful," but clarified:  "The only legal point that should stand out in this statement is that there exists no law specifically designating Teleco as a public institution."  In this second declaration, Prime Minister Bellerive also stated, "this does not mean that Haiti's public laws do not apply to Teleco even if no public law designates it as such."  The second declaration detailed the public aspects of Teleco, many of which the government's expert had discussed at trial.  Messrs. Esquenazi and Rodriguez moved for a judgment of acquittal and a new trial on the basis of the declarations, which the district court denied.

---

[3]  Messrs. Rodriguez and Esquenazi were originally indicted along with Mr. Antoine, Mr. Duperval, and Ms. Grandison, but only Rodriguez and Esquenazi were tried together.  Messrs. Perez, Diaz, and Joseph were also indicted and convicted for their roles in the offense.

The presentence investigation report prepared in advance of Mr. Esquenazi's sentencing calculated a base offense level of 12, under United States Sentencing Commission, Guidelines Manual, (USSG) § 2C1.1(a)(2); a 2-level enhancement under because the offense involved more than one bribe, under USSG § 2C1.1(b)(1); a 16-level enhancement based on Terra's receipt of $2.2 million from the bribery scheme, under USSG § 2B1.1(b)(1)(I); a 4-level enhancement for Esquenazi's leadership role in the offense, under USSG § 3B1.1(a); and a 2-level obstruction-of-justice enhancement, under USSG § 3C1.1.  With a criminal history category I, Mr. Esquenazi's guideline range was 292 to 365 months imprisonment. The district court ultimately imposed a below-guideline sentence of 180 months imprisonment.  Mr. Rodriguez, with a guideline range of 151 to 188 months imprisonment, received 84 months.  Before sentencing, the district court entered a forfeiture order holding Messrs. Esquenazi and Rodriguez responsible for $3,093,818.50, which was ultimately made a part of the judgment entered against them.

This is the appeal brought by Messrs. Esquenazi and Rodriguez.

## II.

The FCPA prohibits "any domestic concern" from "mak[ing] use of the mails or any means . . . of interstate commerce corruptly in furtherance of" a bribe to "any foreign official," or to "any person, while knowing that all or a portion of

such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official," for the purpose of "influencing any act or decision of such foreign official . . . in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person." 15 U.S.C. §§ 78dd-2(a)(1), (3).  A "foreign official" is "any officer or employee of a foreign government or any department, agency, or instrumentality thereof."  Id. § 78dd-2(h)(2)(A) (emphasis added).  The central question before us, and the principal source of disagreement between the parties, is what "instrumentality" means (and whether Teleco qualifies as one).

The FCPA does not define the term "instrumentality," and this Court has not either.  For that matter, we know of no other court of appeals who has.  The definition matters in this case, in light of the challenges to the district court's jury instructions on "instrumentality"; to the sufficiency of the evidence that Teleco qualified as an instrumentality of the Haitian government; and to Mr. Esquenazi's contention that the statute is unconstitutionally vague.  Before we address these challenges, however, we must define "instrumentality" for purposes of the FCPA.

We begin, as we always do when construing statutory text, with the plain meaning of the word at issue.  See Harris v. Garner, 216 F.3d 970, 972 (11th Cir. 2000).  According to Black's Law Dictionary, an instrumentality is "[a] means or agency through which a function of another entity is accomplished, such as a

10

branch of a governing body." Id. at 870 (9th ed. 2009). Webster's Third New International Dictionary says the word means "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out: a part, organ, or subsidiary branch esp. of a governing body." Id. at 1172 (3d ed. 1993). These dictionary definitions foreclose Mr. Rodriguez's contention that only an actual part of the government would qualify as an instrumentality — that contention is too cramped and would impede the "wide net over foreign bribery" Congress sought to cast in enacting the FCPA. United States v. Kay, 359 F.3d 738, 749 (5th Cir. 2004). Beyond that argument, the parties do not quibble over the phrasing of these definitions,[4] and they agree an instrumentality must perform a government function at the government's behest. The parties also agree, however, and we have noted in other cases interpreting similar provisions, that the dictionary definitions get us only part of the way there. See Edison v. Douberly, 604 F.3d 1307, 1309 (11th Cir. 2010) (recognizing the Second Circuit's conclusion that "instrumentality" is "a word susceptible of more than one meaning" (citing Green v. New York, 465 F.3d 65, 79 (2d Cir. 2006))). Thus, we turn to other tools to decide what "instrumentality" means in the FCPA.[5]

---

[4] In addition to his more hardline contention, Mr. Rodriguez also adopts Mr. Esquenazi's proposed definition.

[5]  Both defendants urge us to apply the rule of lenity to cabin the definition of "instrumentality." That rule applies, however, only when there is a "grievous ambiguity" in the meaning of the statutory text. Muscarello v. United States, 524 U.S. 125, 138–39, 118 S. Ct. 1911, 1919 (1998) (internal quotation marks omitted). We concluded in Edison that we could derive the meaning of

11

To interpret "instrumentality" as used in the Americans with Disabilities Act, we relied upon what the Supreme Court has called the "commonsense cannon of noscitur a sociis," United States v. Williams, 553 U.S. 285, 294, 128 S. Ct. 1830, 1839 (2008) — that is, "'a word is known by the company it keeps.'" Edison, 604 F.3d at 1309 (quoting Green, 465 F.3d at 79 (quoting, in turn, Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S. Ct. 1579, 1582 (1961))).[6] In the

_____

"instrumentality" from its "plain meaning and context," clearly indicating that, at least in the ADA, no such ambiguity existed. 604 F.3d at 1310. We find no reason to depart from that conclusion now. "[O]ur decision today is based on much more than a guess as to what Congress intended, [so] there is no grievous ambiguity here." Muscarello, 524 U.S. at 139, 118 S. Ct. at 1919 (internal quotation marks omitted).

[6] The defendants rely heavily upon our decision in Edison, arguing it dictates the definition of "instrumentality" they advocate. In that case, we held the word "instrumentality" under the ADA meant "governmental units or created by one." 604 F.3d at 1310. Although we recognize that decision should inform our construction of instrumentality in this case, it ultimately is of little help. First, Edison construed a different statute with a far different purpose. Id. at 1308; see also Perez–Arellano v. Smith, 279 F.3d 791, 794 (9th Cir. 2002) ("[T]he same words in different statutes may have different meanings if a different intention of Congress is manifest in the purpose, history, and overall design or context of the statute."), cited in Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla., 307 F.3d 1318, 1325 n.8 (11th Cir. 2002). Second, Edison recognized that "instrumentality" had to be "constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction." 604 F.3d at 1310. Although the meaning of the word "instrumentality," which the Edison court recognized was not entirely clear, might in isolation vary little if at all in this case, the context is vastly different. The ADA defines "public entity" to include "any department, agency, special purpose district, or other instrumentality of a State." 42 U.S.C. § 12131(1)(B). The word "other" preceding "instrumentality" in the ADA is a critical difference – "other" indicates that, in the ADA, instrumentality is intended as a general catchall for things very much like the preceding words. In Edison, we noted that the canon ejusdem generis produced the same result as noscitur a sociis. 604 F.3d at 1309 n.4 (citing Green, 465 F.3d at 79 n.10). In the FCPA, by contrast, the word preceding "instrumentality" is "any," not "other." Thus, "instrumentality" is not a generalized catchall in the FCPA as it is in the ADA, but instead a distinct class of entities. The Supreme Court has explained that the ejusdem generis canon does not apply where, as here, the term at issue "is not a general or collective term following a list of specific items to which a particular statutory command is applicable (e.g., 'fishing rods, nets, hooks, bobbers, sinkers, and other equipment')." CSX Transp., Inc. v. Ala. Dep't of Revenue, ___ U.S. ___, ___,131 S. Ct.

12

FCPA, the company "instrumentality" keeps is "agency" and "department," entities through which the government performs its functions and that are controlled by the government. We therefore glean from that context that an entity must be under the control or dominion of the government to qualify as an "instrumentality" within the FCPA's meaning. And we can also surmise from the other words in the series along with "instrumentality" that an instrumentality must be doing the business of the government. What the defendants and the government disagree about, however, is what functions count as the government's business.

To answer that question, we examine the broader statutory context in which the word is used. See Edison, 604 F.3d 1307 at1310 ("We have affirmed many times that we do not look at one word or term in isolation but rather look to the entire statute and its context."). In this respect, we find one other provision of the FCPA and Congress's relatively recent amendment of the statute particularly illustrative. First, the so-called "grease payment" provision establishes an "exception" to FCPA liability for "any facilitating or expediting payment to a

1101, 1113 (2011) (emphasis in original) (internal quotation marks omitted). Just like in that example, the word "other" is critically important to construing the word "instrumentality" based on its context. In that vein, "[t]he United States Supreme Court and this Court have recognized on many occasions that the word 'any,'" which modifies "instrumentality" in the FCPA, "is a powerful and broad word, and that it does not mean 'some' or 'all but a few,' but instead means 'all.'" United States v. Townsend, 630 F.3d 1003, 1011 (11th Cir.) (internal quotation marks omitted), cert. denied, 131 S. Ct. 2472 (2011). Finally, Edison actually decided that "a private corporation is not a public entity merely because it contracts with a public entity to provide some service." 604 F.3d at 1310. Our interpretation of "instrumentality" under the FCPA here is, in this respect, fully consonant with Edison. It, too, would exclude a private contractor not controlled or created by the state that provided a service to the public.

13

foreign official . . . the purpose of which is to expedite or to secure the performance of a <u>routine governmental action</u> by a foreign official." 15 U.S.C. § 78dd-2(b). "Routine governmental action" is defined as "an action . . . ordinarily and commonly performed by a foreign official in," among other things, "providing phone service." <u>Id.</u> § 78dd-2(h)(4)(A). If an entity involved in providing phone service could never be a foreign official so as to fall under the FCPA's substantive prohibition, there would be no need to provide an express exclusion for payments to such an entity. In other words, if we read "instrumentality," as the defendants urge, to categorically exclude government-controlled entities that provide telephone service, like Teleco, then we would render meaningless a portion of the definition of "routine governmental action" in section 78dd-2(b). "It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word." <u>Regions Hosp. v. Shalala</u>, 522 U.S. 448, 467, 118 S. Ct. 909, 920 (1998) (citation omitted). Thus, that a government-controlled entity provides a commercial service does not automatically mean it is not an instrumentality. In fact, the statute expressly contemplates that in some instances it would.

Next, we turn to Congress's 1998 amendment of the FCPA, enacted to ensure the United States was in compliance with its treaty obligations. That year, the United States ratified the Organization for Economic Cooperation and

14

Development's Convention on Combating Bribery of Foreign Public Officials in
International Business Transactions (OECD Convention), Dec. 17, 1997, S. Treaty
Doc. No. 105-43, 37 I.L.M. 1 (ratified Dec. 8, 1998, entered into force Feb. 15,
1999).  See International Anti-Bribery and Fair Competition Act of 1998, Pub. L.
No. 105-366, 112 Stat. 3302 (implementing changes to the FCPA pursuant to the
United States' obligations under the OECD Convention).  In joining the OECD
Convention, the United States agreed to "take such measures as may be necessary
to establish that it is a criminal offence under [United States] law for any person
intentionally to offer, promise or give . . . directly or through intermediaries, to a
foreign public official . . . in order that the official act or refrain from acting in
relation to the performance of official duties, in order to obtain or retain business
or other improper advantage in the conduct of international business."  OECD
Convention art. 1.1 (emphasis added).  "Foreign public official" is defined to
include "any person exercising a public function for a foreign country, including
for a . . . public enterprise."  Id. art. 1.4(a).  The commentaries to the OECD
Convention explain that:  "A 'public enterprise' is any enterprise, regardless of its
legal form, over which a government, or governments, may, directly or indirectly,
exercise a dominant influence."  Id. art. 1.4, cmt. 14.  The commentary further
explains:  "An official of a public enterprise shall be deemed to perform a public
function unless the enterprise operates on a normal commercial basis in the

15

relevant market, i.e., on a basis which is substantially equivalent to that of a private enterprise, without preferential subsidies or other privileges." Id. art. 1.4, cmt. 15. In addition to this, the OECD Convention also requires signatories make it a crime to pay bribes to agents of any "public international organisation." Id. art. 1.4(a).

To implement the Convention's mandates, Congress amended the FCPA in 1998. See Pub. L. No. 105-366, 112 Stat. 3302. The only change to the definition of "foreign official" in the FCPA that Congress thought necessary was the addition of "public international organization." 15 U.S.C. 78dd-2(h)(2)(A). This seems to demonstrate that Congress considered its preexisting definition already to cover a "foreign public official" of an "enterprise . . . over which a government . . . exercise[s] a dominant influence" that performs a "public function" because it does not "operate[] on a normal commercial basis . . . substantially equivalent to that of . . . private enterprise[s]" in the relevant market "without preferential subsidies or other privileges." OECD Convention art. 1.4(a) & cmt. 14, 15. Although we generally are wary of relying too much on later legislative developments to decide a prior Congress' legislative intent, the circumstances in this case cause us less concern in that regard.[7] This is not an instance in which Congress merely discussed previously enacted legislation and possible changes to it. Rather,

---

[7] See United States v. Price, 361 U.S. 304, 313, 80 S. Ct. 326, 332 (1960) (holding that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"); but see Times Pub. Co. v. U.S. Dep't of Comm., 236 F.3d 1286, 1292 (11th Cir. 2001) (stating that subsequent legislative history accompanying an amendment to a statute can "specifically demonstrate Congress' intent").

16

Congress <u>did</u> make a change to the FCPA, and it did so specifically to ensure that the FCPA fulfilled the promise the United States made to other nations when it joined the Convention. The FCPA after those amendments is a different law, and we may consider Congress's intent in passing those amendments as strongly suggestive of the meaning of "instrumentality" as it exists today.

We are not alone in finding instruction from the obligations the United States undertook in the OECD Convention and Congress's resulting amendment of the FCPA made in order to comply with those obligations. The Fifth Circuit, in <u>United States v. Kay</u>, concluded that, when Congress amended the FCPA to comply with the duties the United States assumed under the OECD Convention and left intact the FCPA's language outlawing bribery for the purpose of "obtaining or retaining business," the preexisting language should be construed to cover the Convention's mandate that signatories prohibit bribery "'to obtain or retain business <u>or other improper advantage</u> in the conduct of international business.'" 359 F.3d at 754 (quoting OECD Convention art. 1.1) (emphasis added). "Indeed, given the United States's ratification and implementation of the Convention without any reservation, understandings or alterations specifically pertaining to its scope," the Fifth Circuit concluded the defendants' narrow construction of the FCPA "would likely create a conflict with our international

treaty obligations, with which we presume Congress meant to fully comply." Id. at 755 n.68.

Indeed, since the beginning of the republic, the Supreme Court has explained that construing federal statutes in such a way to ensure the United States is in compliance with the international obligations it voluntarily has undertaken is of paramount importance. "If the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements." Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 539, 115 S. Ct. 2322, 2329 (1995); see also Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"). We are thus constrained to interpret "instrumentality" under the FCPA so as to reach the types of officials the United States agreed to stop domestic interests from bribing when it ratified the OECD Convention.

Based upon this reading, we must also reject the invitation from Messrs. Esquenazi and Rodriguez to limit the term only to entities that perform traditional, core government functions. Nothing in the statute imposes this limitation. And were we to limit "instrumentality" in the FCPA in that way, we would put the

18

United States out of compliance with its international obligations.  See OECD

Convention art. 1.4, cmt. 12 (designating as a "public function" "any activity in the

public interest, delegated by a foreign country" (emphasis added)).

The Supreme Court has cautioned that "the concept of a 'usual' or a 'proper'

governmental function changes over time and varies from nation to nation."  First

Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 634

n.27, 103 S. Ct. 2591, 2603 n.27 (1983).  That principle guides our construction of

the term "instrumentality."  Specifically, to decide in a given case whether a

foreign entity to which a domestic concern makes a payment is an instrumentality

of that foreign government, we ought to look to whether that foreign government

considers the entity to be performing a governmental function.  And the most

objective way to make that decision is to examine the foreign sovereign's actions,

namely, whether it treats the function the foreign entity performs as its own.

Presumably, governments that mutually agree to quell bribes flowing between

nations intend to prevent distortion of the business they conduct on behalf of their

people.  We ought to respect a foreign sovereign's definition of what that business

is.[8]  Thus, for the United States government to hold up its end of the bargain under

---

[8] The logic of First National City Bank gives us another reason to reject the notion that "instrumentality" should encompass only entities that perform traditional, core governmental functions.  If what constitutes a core function of a foreign government hews to the intent of that government, then the problems with providing adequate notice to businesses about which payments violate the FCPA would be magnified, not eliminated.  We think it will be relatively easy to decide what functions a government treats as its own in the present tense by resort to

19

the OECD Convention, we ought to follow the lead of the foreign government itself in terms of which functions it treats as its own.

Although we believe Teleco would qualify as a Haitian instrumentality under almost any definition we could craft, we are mindful of the needs of both corporations and the government for ex ante direction about what an instrumentality is.  With this guidance, we define instrumentality as follows.  An "instrumentality" under section 78dd-2(h)(2)(A) of the FCPA is an entity controlled by the government of a foreign country that performs a function the controlling government treats as its own.  Certainly, what constitutes control and what constitutes a function the government treats as its own are fact-bound questions.  It would be unwise and likely impossible to exhaustively answer them in the abstract.  Because we only have this case before us, we do not purport to list all of the factors that might prove relevant to deciding whether an entity is an

---

objective factors, like control, exclusivity, governmental authority to hire and fire, subsidization, and whether an entity's finances are treated as part of the public fisc.  Both courts and businesses subject to the FCPA have readily at hand the tools to conduct that inquiry (especially because the statute contains a mechanism by which the Attorney General will render opinions on request about what foreign entities constitute instrumentalities.  See 15 U.S.C. § 78dd-2(f)(1); 28 C.F.R. §§ 80.1–80.6.  It would be a much more difficult task — involving divining the subjective intentions of a foreign sovereign, parsing history, and interpreting significant amounts of foreign law — to decide what functions a foreign government considers core and traditional.  Cf. South Carolina Educ. Ass'n v. Campbell, 883 F.2d 1251, 1262 (4th Cir. 1989) ("Determining the subjective intent of legislators and the collective motivation of legislatures is a perilous enterprise indeed.").  Busy district courts and lay juries, not to mention companies in the midst of conducting business, would be ill-equipped to make such sensitive distinctions.

20

instrumentality of a foreign government.  For today, we provide a list of some factors that may be relevant to deciding the issue.

To decide if the government "controls" an entity, courts and juries should look to the foreign government's formal designation of that entity; whether the government has a majority interest in the entity; the government's ability to hire and fire the entity's principals; the extent to which the entity's profits, if any, go directly into the governmental fisc, and, by the same token, the extent to which the government funds the entity if it fails to break even; and the length of time these indicia have existed.  We do not cut these factors from whole cloth.  Rather, they are informed by the commentary to the OECD Convention the United States ratified.  See OECD Convention, art. 1.4, cmt. 14 (stating that an entity is "deemed" to be under governmental control "inter alia, when the government or governments hold the majority of the enterprise's subscribed capital, control the majority of votes attaching to shares issued by the enterprise or can appoint a majority of the members of the enterprise's administrative or managerial body or supervisory board").  They are also consistent with the approach the Supreme Court has taken to decide if an entity is an agent or instrumentality of the government in analogous contexts.  See Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 394, 397–99, 115 S. Ct. 961, 972–74 (1995) (concluding Amtrak was an "agency or instrumentality of the United States" because, among other things, it

21

was created by federal statute and a majority of its directors were to be appointed by the President); Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536, 539, 66 S. Ct. 729, 730 (1946) ("[Because Reconstruction Finance Corporation's (RFC)] Directors are appointed by the President and affirmed by the Senate; its activities are all aimed at accomplishing a public purpose; all of its money comes from the Government; its profits, if any, go to the Government; [and] its losses the Government must bear[, t]hat the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely governmental purposes."); Reconstruction Fin. Corp. v. J.G. Menihan Corp., 312 U.S. 81, 83, 61 S. Ct. 485, 486 (1941) (concluding RFC was a "corporate agency of the government" because the United States was the "sole stockholder" and the entity was "managed by a board of directors appointed by the President," even though "its transactions [were] akin to those of private enterprises" and nothing in its organic statute indicated it was an instrumentality of the government).

We then turn to the second element relevant to deciding if an entity is an instrumentality of a foreign government under the FCPA — deciding if the entity performs a function the government treats as its own. Courts and juries should examine whether the entity has a monopoly over the function it exists to carry out; whether the government subsidizes the costs associated with the entity providing

services; whether the entity provides services to the public at large in the foreign country; and whether the public and the government of that foreign country generally perceive the entity to be performing a governmental function.  Just as with the factors indicating control, we draw these in part from the OECD Convention.  See OECD Convention art. 1.4, cmt. 15 ("[A] public enterprise shall be deemed to perform a public function," if it does not "operate[ ] on a normal commercial basis in the relevant market, i.e., on a basis which is substantially equivalent to that of a private enterprise, without preferential subsidies or other privileges."); see also id. art. 1.4, cmt. 12 ("'Public function' includes any activity in the public interest, delegated by a foreign country . . . .").  And we draw them from Supreme Court cases discussing what entities properly can be considered carrying out governmental functions.  See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295–97, 121 S. Ct. 924, 930–31 (2001) (describing situations in which the Court has held "seemingly private behavior may be fairly treated as that of the State itself," recognizing that decision as "a matter of normative judgment [whose] criteria lack rigid simplicity," and including among the relevant factors whether "the State provides significant encouragement, either overt or covert"  and if the entity "serve[s a] public purpose [such as] providing community recreation" (internal quotation marks omitted)).  Compare Reconstruction Fin. Corp., 312 U.S. at 83, 61 S. Ct. at 486 (recognizing that the

RFC's function to make loans and investments to aid state and local governments, banks, railroads, mortgage companies, and other businesses were "transactions . . . akin to those of private enterprises"), with Cherry Cotton Mills, Inc., 327 U.S. at 539, 66 S. Ct. at 730 (stating that the RFC was "an agency selected by the Government to accomplish purely governmental purposes" (emphasis added)).

III.

A.    The Foreign Corrupt Practices Act Convictions

We now turn to Esquenazi's and Rodriguez's specific challenges to their convictions under the FCPA.

1.    The district court's "instrumentality" instruction

With the definition of "instrumentality" in mind, we now examine what Messrs. Esquenazi and Rodriguez assert was the district court's chief error with respect to whether Teleco was an instrumentality of the Haitian government — the jury instructions. Notably, the list of factors we identified, although a bit more detailed, is not so different from what the district court laid out in its instructions to the jury here. We review de novo the district court's instructions to determine whether they misstated the law or prejudicially misled the jury. United States v. Felts, 579 F.3d 1341, 1342 (11th Cir. 2009). The district court instructed the jury:

> An instrumentality of a foreign government is a means or agency through which a function of the foreign government is accomplished. State-owned or state-controlled companies that provide services to the public may meet this definition.

24

To decide whether Telecommunications D'Haiti or Teleco is an instrumentality of the government of Haiti, you may consider factors including, but not limited to:

One, whether it provides services to the citizens and inhabitants of Haiti.

Two, whether its key officers and directors are government officials or are appointed by government officials.

Three, the extent of Haiti's ownership of Teleco, including whether the Haitian government owns a majority of Teleco's shares or provides financial support such as subsidies, special tax treatment, loans or revenue from government mandated fees.

Four, Teleco's obligations and privileges under Haitian law, including whether Teleco exercises exclusive or controlling power to administer its designated functions.

And five, whether Teleco is widely perceived and understood to be performing official or governmental functions.

Both Mr. Esquenazi and Mr. Rodriguez contend these instructions caused the jury to convict them based only on the fact that Teleco was a government-owned entity that performed a service, without any determination that the service it performed was a governmental function. We cannot agree. Read in context, the district court's instructions make plain that provision of a service by a government-owned or controlled entity is <u>not</u> by itself sufficient. The district court explained only that an entity that provides a public service "may" meet the definition of "instrumentality," thus indicating that providing a service is not categorically

25

excluded from "a function of the foreign government." But the sentence just before explained with no equivocation that only "a means or agency [that performs] a function of the foreign government" would qualify as an instrumentality. Although, read in isolation, the portions of the instruction addressing the provision of services could sweep too broadly, when constrained by the actual definition of "instrumentality" the district court gave and the other guiding factors the district court outlined, we find no error in these instructions. Indeed, they substantially cover the factors we previously outlined.[9] The instructions, we conclude, neither misstated the law nor prejudicially misled the jury regarding the definition of "instrumentality."[10] Felts, 579 F.3d at 1342.

---

[9] The only two factors we provide today that the court's instructions did not include were the length of the government's control over Teleco and whether Teleco was formally designated a government owned entity. As we have said, however, the factors we provide here are intended merely as a helpful, non-exhaustive list. We observe that the facts relevant to these factors would be neutral at best in this case. For, although Haiti never specifically designated Teleco a government entity, the company had an entity suffix indicating that it was funded with government money because "the government consider[ed] Teleco as its . . . entity," and Haiti later passed a law expressly designating its officials as subject to a public anti-corruption law. . And Teleco came into being based upon a contract created by the government. Indeed, the Haitian government has owned almost all equity in the company and has appointed all board members and the chief officer for nearly 40 years, since shortly after it was created. . Ultimately, district courts have "wide discretion" in crafting jury instructions and we cannot say that omission of those two factors leave us "with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." United States v. Svete, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc) (citation omitted).

[10] Because we conclude the district court's instructions correctly stated the law and that Messrs. Esquenazi and Rodriguez define "instrumentality" too narrowly, we find no error in the district court's refusal to give their proposed instruction on "instrumentality." See Svete, 556 F.3d at 1161 (reviewing refusal to give requested instructions for an abuse of discretion, reversing only "if the requested instruction is correct, not adequately covered by the charge given, and involves a point so important that failure to give the instruction seriously impaired the party's ability to present an effective case" (citation omitted)).

26

2.    <u>Sufficiency of the evidence Teleco was a Haitian instrumentality</u>

In addition to challenging the "instrumentality" jury instruction, Messrs. Esquenazi and Rodriguez also argue the evidence was insufficient to demonstrate that Teleco was an instrumentality of the Haitian government.  We review the sufficiency of the evidence <u>de novo</u>, "viewing the evidence and taking all reasonable inferences in favor of the jury's verdict."  <u>United States v. Fries</u>, 725 F.3d 1286, 1291 (11th Cir. 2013).  In light of our construction of the term, we have little difficulty concluding sufficient evidence supported the jury's necessary finding that Teleco was a Haitian instrumentality.

From Teleco's creation, Haiti granted the company a monopoly over telecommunications service and gave it various tax advantages.  Beginning in early 1970s, and through the years Messrs. Esquenazi and Rodriguez were involved, Haiti's national bank owned 97 percent of Teleco.  The company's Director General was chosen by the Haitian President with the consent of the Haitian Prime Minister and the ministers of public works and economic finance.  And the Haitian President appointed all of Teleco's board members.  The government's expert testified that Teleco belonged "totally to the state" and "was considered . . . a public entity."  Although the expert also testified that "[t]here was no specific law that . . . decided that at the beginning that Teleco is a public entity," he maintained that "government, officials, everyone consider[ed] Teleco as a public

27

administration."  Construed in the light most favorable to the jury's verdict, that evidence was sufficient to show Teleco was controlled by the Haitian government and performed a function Haiti treated as its own, namely, nationalized telecommunication services.

### 3.    Mr. Esquenazi's vagueness challenge

Mr. Esquenazi alone challenges the FCPA as unconstitutionally vague as applied to him.  Mr. Esquenazi's only contention, however, is that the statute would be vague if we interpreted "instrumentality" to include state-owned enterprises that do not perform a governmental function.  But we have not.  Our definition of "instrumentality" requires that the entity perform a function the government treats as its own.  Although we recognize there may be entities near the definitional line for "instrumentality" that may raise a vagueness concern, non-speech vagueness challenges are only cognizable as applied.  See United States v. Mazurie, 419 U.S. 544, 550, 95 S. Ct. 710, 714 (1975) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.").  Because the entity to which Mr. Esquenazi funneled bribes was overwhelmingly majority-owned by the state, had no fisc independent of the state, had a state-sanctioned monopoly for its activities, and was controlled by a board filled exclusively with government-appointed individuals, the FCPA is not vague as applied to his conduct.  See Parker v. Levy, 417 U.S.

28

733, 756, 94 S. Ct. 2547, 2562 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").

  4. <u>Whether Mr. Esquenazi and Mr. Rodriguez possessed the requisite knowledge</u>

Messrs. Esquenazi and Rodriguez also aim challenges at the knowledge element of the FCPA. Both challenge the district court's jury instructions on the element. And Mr. Rodriguez challenges the district court's decision to give the jury a deliberate-ignorance instruction as well as the sufficiency of the evidence that he knew Teleco was a Haitian instrumentality.[11] We address these in turn.

*a. The district court's "knowledge" instructions*

In its instructions, the district court told the jury that knowledge was an essential element of each FCPA charge, and that, to convict on the FCPA charges, the jury had to find each bribe payment was "made to any person while knowing that all or a portion of such money or thing of value will be offered, given or

---

[11] Mr. Esquenazi's brief states that he adopts his codefendant's FCPA challenges. With the exception of the court's "knowledge" instructions to the jury, we decline to permit him to do so. "Sufficiency arguments . . . are too individualized to be generally adopted." United States v. Cooper, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000) (alteration and citation omitted). For the same reason — that the analysis is highly dependent on the factual circumstances — Mr. Esquenazi cannot generally adopt Mr. Rodriguez's deliberate-ignorance-instruction challenge. See United States v. Rivera, 944 F.2d 1563, 1570–71 (11th Cir. 1991) (recognizing "such a charge should not be given in every case in which a defendant claims a lack of knowledge, but only in those comparatively rare cases where there are facts that point in the direction of deliberate ignorance," and emphasizing that courts must determine "whether a deliberate ignorance instruction is proper in a particular case" (emphasis added and internal alterations and quotation marks omitted)). And, because Mr. Esquenazi fails to discuss what facts (or lack of facts) undermine the district court's decision to give the instruction, we do not address the propriety of the instruction as applied to him. See id.

promised directly or indirectly to any foreign official." The district court explained that "knowing" meant actual knowledge or a firm belief of the existence of a particular circumstance or result. Messrs. Esquenazi and Rodriguez contend this instruction was erroneous because it misled the jury to believe it could convict if either knew their intermediary (namely, Grandison at TCSC) would make a payment to a person who just "happened" to be a foreign official without their prior knowledge. In other words, they argue, the instruction failed to make clear that they must have known the recipient of the bribe payment would be a foreign official.[12] Messrs. Esquenazi and Rodriguez failed to timely raise this argument before the district court, so we review only for plain error. See United States v. Wright, 392 F.3d 1269, 1277 (11th Cir. 2004) ("[T]o preserve an objection to jury instructions for appellate review, a party must object before the jury retired, stating distinctly the specific grounds for the objection." (citation omitted)). To surmount this standard of review, the challenger must show "instruction was an incorrect statement of the law and [that] it was probably responsible for an incorrect verdict, leading to substantial injustice." Id. at 1279 (citation omitted).

We conclude there was no error here, plain or otherwise. The court's instructions, read in their entirety, make clear the jury had to find Messrs.

---

[12]   To the extent Mr. Rodriguez contends only actual knowledge will suffice, that argument is flatly foreclosed by the text of the FCPA. See 15 U.S.C. § 78dd-2(h)(3)(A) ("A person's state of mind is 'knowing'" for purposes of the statute if he has actual knowledge or "a firm belief that such circumstance exists or that such result is substantially certain to occur.").

30

Esquenazi and Rodriguez knew or believed the bribes would ultimately reach the hands of a foreign official.  The court listed as one of the essential elements of the FCPA charges "that the payment or gift was to a foreign official or to any person while the defendant knew that all or a portion of the payment or gift would be offered, given or promised, directly or indirectly to a foreign official."  This statement, as well as the court's definition of "knowing," directly tracked the FCPA's language.  See 15 U.S.C. § 78dd-2(a)(3), (h)(3)(A).  The instruction was a correct legal statement, was clearly delivered, and nothing in its language was misleading to the jury.[13]

### b. The deliberate-ignorance instruction

At the charge conference, the court considered whether to give the jury a deliberate-ignorance instruction, which would permit the jury to return a guilty verdict if it found "[d]eliberate avoidance of positive knowledge."  Mr. Rodriguez objected to the instruction, arguing the evidence at trial showed he did not know about Terra's illegal activity, not that he simply ignored the unlawful transactions. The district court acknowledged that evidence of deliberate ignorance was "sparse," but gave the instruction, based on the government's argument that because testimony at trial showed Mr. Rodriguez was distracted from work by

---

[13]   Because we conclude the district court's instructions were a correct statement of the law, we need not address the merit of the knowledge instruction proposed by these defendants at trial. See Svete, 556 F.3d at 1161.

family obligations they needed to explain as a financial executive, Mr. Rodriguez was in a position to know the illegality of the payments he was authorizing.  Mr. Rodriguez maintains this is error, and we agree.  We have cautioned district courts against instructing juries on deliberate ignorance "when the evidence only points to either actual knowledge or no knowledge on the part of the defendant."  United States v. Stone, 9 F.3d 934, 937 (11th Cir. 1993) (citing Rivera, 944 F.2d at 1570–71).  "A deliberate ignorance instruction is appropriate only when there is evidence in the record showing the defendant purposely contrived to avoid learning the truth."  Id. (internal quotation marks omitted).  There is no such evidence for Mr. Rodriguez.

Nonetheless, in light of the overwhelming evidence Mr. Rodriguez had actual knowledge he was authorizing unlawful payments, and the district court's thorough instructions on the knowledge element, the error was harmless.  See id. at 937–38 (reviewing erroneous deliberate-ignorance instruction for harmless error); see also United States v. Neder, 197 F.3d 1122, 1129 (11th Cir. 1999) (recognizing that, to show an instructional error was harmless, the government must show the evidence on the element the instruction targeted was so overwhelming "that no rational jury, properly instructed" on that element, could have acquitted the defendant).  Mr. Perez testified that, after Mr. Antoine accepted an offer for side-payments in exchange for a reduction in Terra's bills, he told Mr. Rodriguez of the

32

deal.  Upon hearing the news, Mr. Rodriguez "congratulated [Mr. Perez] on a job well done."  Mr. Rodriguez authorized a number of side payments to Mr. Antoine through J.D. Locator, and he continued this practice by authorizing payments to TCSC.  In fact, Mr. Rodriguez's name is on every transfer to TCSC that corresponds to a substantive FCPA charge.  Because overwhelming evidence supports the jury's finding that Mr. Rodriguez had actual knowledge of the unlawful nature of his payments, we will not reverse on the basis of an erroneous deliberate-ignorance instruction.  See id.

c. *Sufficiency of the evidence that Mr. Rodriguez had the requisite knowledge*

Mr. Rodriguez challenges the sufficiency of the evidence that he had knowledge the recipient of the payments he made was a foreign official.  We review de novo his sufficiency challenge.  Fries, 725 F.3d at 1291. "The relevant question in reviewing a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Demarest, 570 F.3d 1232, 1239 (11th Cir. 2009) (citation omitted and emphasis added).

Mr. Rodriguez asserts there was no evidence that he had actual knowledge of the ways Teleco was connected to the Haitian government making it an

33

"instrumentality," or of the fact that Teleco employees were foreign officials.

Although he presents these as distinct elements, they are the same. Provided Mr.

Rodriguez knew (or believed) Teleco was a Haitian instrumentality, he knew any

Teleco employee was a foreign official. See 15 U.S.C. § 78dd-2(h)(2)(A)

(defining "foreign official" as "any officer or employee of a foreign government or

any . . . instrumentality thereof"). Mr. Rodriguez concedes, based on Terra's

previous political-risk insurance application for a Teleco contract, that he knew

Teleco was government-owned. But he says this shows nothing more than that he

knew Teleco employees worked for a state-owned enterprise. He says this is

neither in dispute nor dispositive of whether he knew Teleco was a Haitian

instrumentality and, therefore, its employees were foreign officials.

As we pointed out above, Mr. Rodriguez's conception of "instrumentality"

— and thus, what the government had to prove he knew — is too narrow.

Actually, the government bore the burden of proving Teleco was controlled by the

Haitian government and performed a function the government treated as its own.

Our review of the record shows sufficient evidence of Mr. Rodriguez's knowledge

of Teleco's status as an instrumentality (and thus Messrs. Antoine and Duperval's

statuses as foreign officials) supports the jury's finding of guilt. For example,

insurance broker John Marsha testified extensively at trial about the political-risk

insurance policy Terra tried to obtain on a Teleco contract that ultimately fell

34

through.  According to Mr. Marsha, the type of policy Terra sought is only available when contracting with a foreign government.  Mr. Marsha testified that he received a phone call from Messrs. Esquenazi, Rodriguez, and Dickey, who said they wanted to insure contracts with "foreign governments."  After Mr. Marsha sent an application for political-risk insurance, Mr. Dickey emailed Marsha (copying Messrs. Rodriguez and Esquenazi) with an attached insurance application listing Teleco as a "government-owned entity."  Later, when the insurer had doubts about what recourse it might have against the Haitian government if the proposed Teleco/Terra contract was breached, Mr. Dickey (again copying Messrs. Rodriguez and Esquenazi) emailed Mr. Marsha and said:  "With respect to Haiti, we may be able to get a letter from the TELECO President to the effect that TELECO is an instrumentality of the Haitian government. Would this help expedite matters?"  And, when the insurer became concerned the policy's force majeure clause might permit "the Haitian government" to cancel the contract with Terra, Messrs. Dickey, Rodriguez, and Esquenazi discussed this possibility at length with Mr. Marsha.  Also based on his status as a Terra executive directly involved in deals with Teleco, the jury reasonably could infer Mr. Rodriguez knew the company had a state-sanctioned monopoly over telecommunications in Haiti.  That evidence was sufficient to support a jury finding that Mr. Rodriguez knew Teleco was an instrumentality of the Haitian government.  And because it is undisputed that he

35

knew Messrs. Antoine and Duperval were Teleco employees, that evidence supports a finding he knew they qualified as foreign officials under the FCPA. See 15 U.S.C. §§ 78dd-2(a)(3), (h)(2)(A).

5. Whether the declarations by Prime Minister Bellerive warranted a Brady hearing

Five days after the jury returned its verdict, counsel for Patrick Joseph, who was indicted along with Messrs. Esquenazi and Rodriguez but tried separately, gave the government a declaration from Haitian Prime Minister Jean Max Bellerive. In that declaration, Prime Minister Bellerive indicated Teleco was not a state enterprise of Haiti. On August 10, 2011, the day after receiving it, the government shared the Prime Minister's declaration with counsel for Messrs. Esquenazi and Rodriguez. The two sought a new trial, or at least an evidentiary hearing, based upon this newly discovered evidence, but the district court denied their motion. On appeal, Messrs. Esquenazi and Rodriguez contend the district court erred in denying them a hearing on whether the fact that they did not have the declaration before trial violated Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963).

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Id. We review for an abuse

36

of discretion the denial of an evidentiary hearing on an asserted Brady violation.

United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998).  To establish

that the government has violated Brady, a defendant must show that:

> (1) the government possessed evidence, including impeachment
> evidence, favorable to the defense; (2) [the defense] did not possess
> the evidence nor could have obtained it with reasonable diligence; (3)
> the prosecution suppressed the favorable evidence; and (4) had the
> evidence been disclosed to the defense, a reasonable probability exists
> that the trial outcome would have been different, i.e., the evidence
> was material.

United States v. Arnold, 117 F.3d 1308, 1315 (11th Cir. 1997).

Even if we accept the assertions in the Prime Minister's declaration (which

he later clarified to explain that Teleco was "fully funded and controlled by BRH,

which is a public entity of the Haitian State") as material, the district court did not

abuse its discretion in denying Messrs. Esquenazi and Rodriguez a hearing on their

Brady claims because the evidence does not qualify as Brady material.  "Brady

applies only to information possessed by the prosecutor or anyone over whom he

has authority."  United States v. Naranjo, 634 F.3d 1198, 1212 (11th Cir. 2011)

(internal quotation marks omitted).  And where the government does not have

evidence in its possession, the prosecution cannot have suppressed it, either

willfully or inadvertently.  Id.  In response to the motion for a new trial, a member

of the prosecution team swore, under oath, that the government only learned of the

declaration after Messrs. Rodriguez and Esquenazi were convicted. Neither defendant points to any contrary evidence.

Despite the complete absence of evidence to show the prosecution possessed the original declaration of the Prime Minister, Messrs. Esquenazi and Rodriguez assert they were still entitled to an evidentiary hearing on a possible Brady violation. They argue the government has not proved it did not know of the declaration's substance; that the government had unique access to the Haitian Prime Minister; and that the knowledge of Haitian officials should be imputed to the prosecution. None of these arguments convinces us the district court was required to hold an evidentiary hearing. First, the burden to show a Brady violation lies with the defendant, not the government, so the prosecution was not required to prove lack of knowledge of the declaration's contents on top of not having the declaration. See United States v. Vallejo, 297 F.3d 1154, 1164 (11th Cir. 2002). Second, there is no evidence that the government was so uniquely situated with respect to the information in the declaration that it was required to go out and learn what it did not know. See Naranjo, 634 F.3d at 1212 ("A prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a Brady request for information regarding a government witness." (citation omitted)). Indeed, the evidence was discovered by a codefendant, albeit one tried

38

separately.  Third, no court, to our knowledge, has held that information known to an independent foreign government may be imputed to prosecutors in the United States simply when the foreign government cooperates in an investigation.  In fact, the case Messrs. Esquenazi and Rodriguez rely upon explained that imputation was appropriate because "the state investigators functioned as agents of the federal government under the principles of agency law."  United States v. Antone, 603 F.2d 566, 570 (5th Cir. 1979) (emphasis added).  Nothing approaching such a relationship between the Prime Minster of Haiti and federal prosecutors existed here.  The district court did not abuse its discretion.

B.      The Count 1 conspiracy conviction

For all of the reasons set forth above, Messrs. Esquenazi's and Rodriguez's challenges to their substantive FCPA convictions fail.  And, because they do not attempt to rebut other elements of Count 1's conspiracy charge — the agreement to achieve an unlawful objective (the FCPA violations) itself, knowing and voluntary participation in the agreement, or commission of overt acts in furtherance of the agreement[14] — their conviction for conspiracy to violate the FCPA stands.  For this reason, and because the jury expressly found Messrs. Esquenazi and Rodriguez guilty on the FCPA object of the conspiracy, we need not address their challenges to the alternative wire-fraud object of the same conspiracy.

---

[14]   See United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003) (listing elements of conspiracy under 18 U.S.C. § 371).

C.    The money-laundering convictions

The jury convicted Mr. Rodriguez of, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity," "conduct[ing] . . . such a financial transaction which in fact involves the proceeds of specified unlawful activity" while knowing the transaction was designed to conceal the nature, location, source, ownership, or control of those proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). Mr. Rodriguez[15] argues we must reverse his money-laundering convictions,[16] either because they merged in the indictment with the underlying FCPA bribery charges or because the evidence at trial failed to show the transactions involved "proceeds" of the underlying FCPA offenses, resulting in impermissible merger.[17]    Because he moved to dismiss the indictment based on merger, we review the denial of that motion for an abuse of discretion, examining

---

[15] In his reply brief, Mr. Esquenazi asserts that he adopted Mr. Rodriguez's contentions regarding the merger of the money-laundering counts in his initial brief. A careful review, however, conclusively shows Mr. Esquenazi's adoption of Mr. Rodriguez's argument with respect to the money-laundering convictions related only to the use of Haitian bribery law as an underlying unlawful activity. We therefore consider only Mr. Rodriguez to properly have raised a claim that his money-laundering convictions merged with the underlying offenses. See Jackson v. Comm'r of Soc. Sec., 601 F.3d 1268, 1274 n.4 (11th Cir. 2010) ("Normally, we will not address an argument raised for the first time in a reply brief." (citation omitted)).

[16] Messrs. Esquenazi and Rodriguez relatedly contend the money-laundering convictions must be reversed because they were not predicated on a proven "specified unlawful activity." They target the Haitian-bribery-law predicate the indictment lists alongside FCPA violations and wire fraud. Because we affirm the FCPA convictions, however, this argument necessarily fails as those convictions are valid money-laundering predicates.

[17] We understand Mr. Rodriguez to argue that the evidence in a trial could be insufficient to show that two crimes were distinct offenses, requiring us to reverse based upon the sufficiency of the evidence. However, his brief does little to help us understand this theory. Yet, because the evidence clearly did demonstrate two distinct offenses, we address the contention as Mr. Rodriguez has framed it.

the legal sufficiency of the indictment de novo.  United States v. Schmitz, 634 F.3d 1247, 1259 (11th Cir. 2011).  But Mr. Rodriguez did not seek a judgment of acquittal at trial based on the second contention he now makes.[18]  Where the specific grounds upon which a defendant made his sufficiency-of-the-evidence challenge at trial differ from those he asserts on appeal, we review under his new theory only for manifest miscarriage of justice.  See Fries, 725 F.3d at 1291; see also United States v. Hurn, 368 F.3d 1359, 1368 (11th Cir. 2004) (treating as unpreserved a contention that evidence was insufficient where a different specific basis was raised in renewed motion for judgment of acquittal at trial).  So we would reverse Mr. Rodriguez's money-laundering convictions for insufficient evidence only if they are "shocking."  Fries, 725 F.3d at 1291.

We conclude there was no merger of the money-laundering charges with underlying offenses that generated the proceeds to be laundered, either in the indictment or as a result of the evidence adduced at trial.  Mr. Rodriguez bases his contention on the Supreme Court's decision in United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020 (2008).  Because no majority of the Court agreed upon a

---

[18] We are wholly unconvinced by Mr. Rodriguez's contention that he properly preserved a challenge to the sufficiency of the evidence that the crimes were distinct offenses when he claimed, in his post-conviction motion for a new trial, that the district court erred in denying his motion to dismiss the indictment. See United States v. Bischel, 156 F.3d 1148, 1150 (11th Cir. 1998) (concluding that challenge to the sufficiency of the evidence must be raised at the close of the evidence to properly preserve it for appeal); see also United States v. Langford, 647 F.3d 1309, 1326 n.11 (11th Cir. 2011) ("To preserve an issue for appeal . . . an objection on other grounds will not suffice." (internal quotation marks omitted)).

41

rationale in Santos, we have recognized that the narrowest concurring opinion, that written by Justice Stevens, controls. United States v. Jennings, 599 F.3d 1241, 1252 (11th Cir. 2010); see also Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." (internal quotation marks omitted)). With that in mind, Santos merely states that the gross receipts of an illegal gambling operation were not "proceeds" for purposes of a so-called "promotional" money-laundering offense under 18 U.S.C. § 1956(a)(1)(A)(i). Jennings, 599 F.3d at 1252.

We first observe that there is a distinction between a promotional money-laundering conviction under § 1956(a)(1)(A)(i) (i.e., using funds from a criminal business to "promote the carrying on of [the] specified unlawful activity"), like the one at issue in Santos, and a concealment money-laundering conviction under 18 U.S.C. § 1956(a)(1)(B)(i), like Mr. Rodriguez's. This difference eliminates entirely for this case any double-punishment concern, like the one that motivated a majority of the Justices in Santos. See Santos, 553 U.S. at 514–19, 128 S. Ct. at 2026–28 (plurality opinion) (discussing the "merger problem" if funds used to pay an illegal business's expenses are proceeds laundered under § 1956(a)(1)(A)); id.

42

at 527, 128 S. Ct. at 2033 (Stevens, J., concurring) ("Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy . . . ."). Conducting a criminal enterprise necessarily requires paying its essential expenses — doing so should not also be separately punishable as money-laundering, at least when the rule of lenity comes into play. Id., at 514–15, 528, 128 S. Ct. at 2033–34 ("As the plurality notes, there is 'no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime.' This conclusion dovetails with what common sense and the rule of lenity would require." (internal citation omitted)). No such problem of overlap arises where, as here, a money-laundering conviction under the concealment prong involves conduct that was entirely <u>unnecessary</u> to the completion of the underlying specified unlawful activity. Funneling money through shell corporations was not necessary for Mr. Rodriguez to bribe a foreign official. It just made it less likely that conduct would be uncovered by "conceal[ing] the nature[ and] source . . . of the proceeds" he and his coconspirators used to pay the bribes, precisely the distinct type of conduct 18 U.S.C. § 1956(a)(1)(B)(i) criminalizes.

43

Still, Mr. Rodriguez points to a supposed timing problem, which is that the funds pushed through the intermediary corporations, ultimately to Messrs. Duperval and Antoine or their associates, could not be "proceeds" because the underlying FCPA bribery was not complete.  But this argument mistakes the basis for the underlying FCPA convictions.   When Terra <u>promised</u> Messrs. Antoine and Duperval bribery payments in exchange for reducing the amounts Terra owed Teleco, the FCPA violation <u>was</u> already complete — an "offer" or a "promise to pay" a foreign official for a business benefit is just as unlawful as an actual "payment" under that statute.  15 U.S.C. § 78dd-2(a).  Thus, the lowered debt Terra received in exchange for that promise constituted "proceeds" of a completed FCPA offense, which the company then funneled through intermediary companies "to conceal both the source and future ownership of the money," thereby completing several concealment money-laundering offenses.   <u>United States v. Wilkes</u>, 662 F.3d 524, 547 (9th Cir. 2011), <u>cert.</u> <u>denied</u> 132 S. Ct. 2119 (2012).

For these reasons, we conclude the district court did not err in refusing to dismiss the money-laundering counts of the indictment or in allowing the jury to decide these counts.  Both the allegations and evidence supported the jury's finding

that Messrs. Esquenazi and Rodriguez engaged in criminal acts distinct from, and which therefore did not merge with, the substantive FCPA counts.[19]

D.    Sentencing Challenges

Messrs. Esquenazi and Rodriguez challenge various aspects of their sentences.  We discuss each of these in turn.

1.  Enhancement for "the value of the benefit received" by Terra

Section 2C1.1(b)(2) of the Sentencing Guidelines, and the corresponding tables in § 2B1.1(b)(1), provide for a 16-level enhancement if the value of "the benefit received or to be received in return for the payment" of a bribe — provided that value is greater than the value of the bribe payment itself — is more than $1 million but less than $2.5 million.  USSG § 2B1.1(b)(1).  The district court calculated that Terra received a total of $2.2 million in bill reductions and applied the enhancement.  Messrs. Esquenazi and Rodriguez[20] argue the value of "the benefit received" should be the value they each received individually, not what Terra received.  And, because that value is unclear, the correct calculation should be based on the value of the bribe payments, which, at a total of $839,815, triggers only a 14-level enhancement.    Both defendants objected to the enhancement at

---

[19]  To the extent Mr. Rodriguez's merger contentions also relate to his money-laundering conspiracy conviction, we affirm that conviction as well for the same reasons we affirm the FCPA conspiracy conviction.

[20]   The government contends, citing Cooper, 203 F.3d at 1285 n.4, that Mr. Rodriguez cannot generally adopt Mr. Esquenazi's argument on this point as he attempts to do in his brief.  But Mr. Esquenazi's challenge is largely a legal, not a factual one, so we permit Mr. Rodriguez to adopt it.

sentencing, arguing only a 14-level enhancement should apply. They did not, however, advocate the 14-level enhancement for the reason they now assert. Counsel for Mr. Esquenazi requested the 14-level enhancement to maintain parity with his codefendants, who pleaded guilty. And Mr. Rodriguez's counsel argued the government's loss calculation was illusory because, due to valuable equipment that Terra owned and Teleco kept, there was no way to say for certain that Terra benefited to the tune of $2.2 million. Because the district court did not have the opportunity to examine and rule on the argument now before us, we are limited to reviewing only for plain error. See United States v. Massey, 443 F.3d 814, 819 (11th Cir. 2006) ("The defendant . . . fails to preserve a legal issue for appeal if the factual predicates of an objection are included in the sentencing record, but were presented to the district court under a different legal theory."). This being the case, we may reverse only if "there is: (1) error, (2) that is plain, and (3) that affects substantial rights[,] and then only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 818 (alterations and internal quotation marks omitted). And nothing in our case law makes any error in this case plain. See United States v. Hernandez-Gonzalez, 318 F.3d 1299, 1302 (11th Cir. 2003) ("An error cannot be plain if such error is not obvious or clear under current law."). Indeed, we have interpreted our own precedent to mean the loss calculation is based on the improper benefit to a company. See United States

46

v. Huff, 609 F.3d 1240, 1245–46 (11th Cir. 2010) (interpreting United States v. DeVegter, 439 F.3d 1299 (11th Cir. 2006), to mean "the improper benefit to the investment firm should have been used as the loss amount" — rather than the amount of bribe payments — for purposes of a § 2B4.1 enhancement, and applying that case's reasoning to a § 2C1.1 enhancement (emphasis added)).  Although we were not squarely presented with the issue of whether an entity or an individual's benefit should be calculated in Huff, its language forecloses the possibility that any error regarding the loss amount calculation in this case could be plain.

    2.  Mr. Esquenazi's 4-level leadership-role enhancement

Because it found him "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the district court enhanced Mr. Esquenazi's guideline range by four levels.  USSG § 3B1.1(a).  We review the district court's finding that Mr. Esquenazi was an organizer or leader for clear error.  United States v. Barner, 572 F.3d 1239, 1247 (11th Cir. 2009).  Mr. Esquenazi contends he instead should have been characterized, at most, as a "manager or supervisor," which carries with it only a three-level enhancement under § 3B1.1(b).  He argues that he was a leader only in Terra's legitimate business operations and points to the substantial independent roles of others like Messrs. Rodriguez, Perez, and Antoine in the bribery scheme.

As a preliminary matter, the roles of Mr. Esquenazi's co-conspirators do not change our analysis even if those individuals also played major roles in the offense conduct. See USSG § 3B1.1, comment. (n.4) ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). The Sentencing Guidelines commentary provides several factors that distinguish a leadership role from a management role, including

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id. comment. (n.4). The district court considered many of these factors and concluded that Mr. Esquenazi was "in charge" of the bribery, served as "the boss of Mr. Rodriguez in addition to the others," and "was in fact the leader of the organization, and not just the president in name" because "he actually participated in many of the decisions" involving the bribery scheme. We cannot say, in light of extensive testimony at trial about Mr. Esquenazi's involvement in each step of the scheme, that the court's fact-findings are clearly erroneous. Thus, we find no error in the imposition of the enhancement.

### 3. Mr. Esquenazi's obstruction enhancement

The Sentencing Guidelines provide for a 2-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the

48

administration of justice" with respect to the investigation or prosecution of the case.  USSG § 3C1.1.  This includes willful false sworn testimony on a material matter.  United States v. Dunnigan, 507 U.S. 87, 93–94, 113 S. Ct. 1111, 1116 (1993).  Mr. Esquenazi argues the district court failed to make findings of specific instances of perjury.[21]  And he is right that, when applying an obstruction enhancement, "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding."  Id. at 95, 113 S. Ct. at 1117.  But Mr. Esquenazi never objected to the lack of specificity of the court's findings at sentencing or afterwards, and we have repeatedly outright declined to entertain such a complaint for the first time on appeal.  See, e.g., United States v. Smith, 231 F.3d 800, 820 (11th Cir. 2000); United States v. Hubert, 138 F.3d 912, 915 (11th Cir. 1998) (citing United States v. Geffrard, 87 F.3d 448, 453 (11th Cir. 1996)).  Beyond that, "[i]n the context of the record of the [sentencing] hearing," sometimes "detailed findings [are] not necessary and would [be] redundant."  Hubert, 138 F.3d at 915.  At sentencing, the government identified at least four instances in which Mr. Esquenazi gave willful false testimony at trial:  (1) when he denied that Teleco invoices were, in fact, invoices (that reflected reduced debt due

---

[21]  Mr. Esquenazi also contends the district court improperly commented on his demeanor when determining whether the enhancement was appropriate.  But where the district court "must make a particularized assessment of the credibility or demeanor of the defendant, such as when applying the obstruction of justice enhancement for perjury, we accord special deference to the district court's credibility determinations."  United States v. Banks, 347 F.3d 1266, 1269 (11th Cir. 2003).  There was, therefore, no error in the district court's comments on Mr. Esquenazi's conduct at trial.

to Terra's bribe payments); (2) when he denied having ever bribed Mr. Antoine;

(3) when he denied sending Mr. Perez to discuss the bribes with Antoine; and (4)

when he said the IRS agent who investigated him lied about his confession to

bribing Mr. Duperval.  Each of these statements, the government pointed out, was

flatly contradicted by other witness testimony and documentary evidence.  The

district court acknowledged each of these instances and concluded, "we're not

talking about one.  We're not talking about two.  We're talking about a bunch" of

falsehoods.  Taking these statements in context, we are satisfied that the district

court's failure to make specific findings of perjury does not warrant reversal for

resentencing.

4.  Mr. Rodriguez's forfeiture order

Mr. Rodriguez contends his forfeiture order and the amended judgment that

reflects the forfeiture amount must be vacated because the district court failed to

order forfeiture at sentencing.[22]  He cites the general rule that, where the orally

imposed sentence conflicts with the written judgment, the court's orally

pronounced sentence controls.  But Federal Rule of Criminal Procedure 32.2

expressly requires only that the court announce the forfeiture amount "or . . .

otherwise ensure that the defendant knows of the forfeiture at sentencing."  Fed. R.

Crim. P. 32.2(b)(4)(B).  Mr. Rodriguez's counsel objected to the forfeiture amount

---

[22]  Because Mr. Rodriguez did not object to the forfeiture order's entry, plain-error review
applies.  United States v. Aguillard, 217 F.3d 1319, 1320 (11th Cir. 2000).

at sentencing, "ensuring" that he was on notice of the forfeiture. Further, Rule 32.2 explicitly provides that the court's failure to include the forfeiture order, directly or by reference, in the judgment "may be corrected at any time under Rule 36," which in turn permits the court to correct clerical errors. Id.; Fed. R. Crim. P. 36. This is precisely what the district court did in this case, so there was no error, plain or otherwise.

IV.

After careful consideration, and for all of these reasons, we conclude the convictions and sentences of both Messrs. Esquenazi and Rodriguez are due to be

**AFFIRMED.**